Andre CATHRON, Petitioner,

v.

Warden Kurt JONES, Respondent.

No. 00–CV–75347–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 15, 2002.

Andre Cathron, Carson City, MI, pro se.

Brenda E. Turner, Mich. Dept. of Atty. Gen., Lansing, MI, for Kurt Jones.

### MEMORANDUM OPINION AND ORDER

FRIEDMAN, District Judge.

This matter is before the Court on petitioner Andre Cathron's *pro se* habeas corpus petition under 28 U.S.C. § 2254. The Court has concluded for the following reasons that the petition should be denied.

## I. *Background*

In 1996, Petitioner and his co-defendant, Stephen Terry, were tried together. Terry was convicted of armed robbery, first-degree home invasion, and possession of a firearm during the commission of a felony. The jury was unable to reach a decision about Petitioner.

Petitioner was re-tried in 1997, and on January 31, 1997, a Genesee County jury found him guilty of two counts of armed robbery, MICH.COMP.LAWS § 750.529, one count of receiving and concealing stolen property worth more than $100.00, MICH. COMP.LAWS § 750.535, and one count of first-degree home invasion, MICH.COMP. LAWS § 750.110a. The victims of these crimes were

Connie Thomas and her teenage daughter, Teika, [who] lived together. Connie Thomas testified that two men came to the door holding inflated helium balloons and asked for Teika by name. She believed that the balloons were for her, her birthday having been two days earlier. As Teika approached the door, the men forced their way into the house, held a gun to the victims, tied the victims up, ransacked the house, and took various items, including televisions and jewelry. Both victims testified that they did not recognize the two men who robbed them, but that the robbers knew them by name. Teika testified that she had known [Petitioner] for a time before the robbery, and that [Petitioner] had come to her house to see her several times in the weeks before the robbery. Connie Thomas had met [Petitioner] on one of the occasions outside the house, when it was dark, and for a short time. She testified that Teika had introduced him as "Drey." Teika testified that a couple of days after the robbery and after [Petitioner] was in jail, a friend of hers called her and there was a three-way conversation with [Petitioner], during which [Petitioner] tried to bribe her not to testify against him by offering her money and one of his cars. Teika testified that she had not previously reported this conversation because she was scared of [Petitioner].

Officer Mata testified that while on routine patrol around 5:00 p.m. on February 6, 1996, he and his partner, Officer Peck, spotted a 1978 Grand Prix matching the description of a car listed on their hot sheet as stolen, that the license plate matched the stolen vehicle's, and that he turned the patrol car around and pursued the stolen vehicle. He observed the car stop and three men jump out, two from the passenger side went in one direction, and one from the driver's side went in another direction. His focus was on the person who jumped out of the car from the driver's side, who was wearing a jean jacket. Mata pursued the man on foot and within one minute came upon a vacant house and heard noises from within that sounded like someone running and falling. [Petitioner] emerged from the back door, which was open, breathing hard, like he had been running, and surprised to see the officer. Following [Petitioner's] arrest, Mata found a blue denim coat behind the garage of the vacant house. Mata testified that water pipes in the house had broken and water ... running down from the upstairs bathroom had formed ice on the kitchen floor.

Officer Peck testified similarly, but was unsure whether one or two passengers emerged from the passenger side of the stolen vehicle. When Peck inspected the Grand Prix, he found a number of items that he later learned had been taken from the Thomas' home, and some helium balloons.

[Petitioner] denied involvement in the alleged incidents and testified that he was at the vacant house where he was

arrested because he was interested in purchasing the house, which was being sold for $2,500. He testified that he did not have permission to go inside but did so when he saw the door was open. The prosecution called the owner of the vacant house in rebuttal, who testified that he had received some inquiries about the house, and had told one caller that ·he would be willing to sell for $2,500, but could not specify when he had spoken to that person.

. . . . .

The prosecution's theory ... was that [Petitioner] aided and abetted the robbery of the two victims ... and drove the get-away car after the robbery. The prosecution asserted that [Petitioner] had visited Teika several times at the Thomas home in the weeks before the robbery, and that the two other men involved in the robbery, neither of whom the Thomas' had met and thus would not recognize, did the actual robbery. The prosecution theorized that the three men went to the Thomas house in a stolen car, that the other two men entered the Thomas' house forcibly, held a gun on the victims, ransacked the house, stole various items from it, loaded them in the stolen car, and with [Petitioner] driving, drove away.

[Petitioner's] theory was that too many pieces were missing from the prosecution's case, in that neither of the victims would testify that they saw [him], nobody saw [him] driving the get-away car or running from the car, or entering the vacant house at which he was arrested. [Petitioner] contended that he had nothing to do with the crimes and was in the vacant house because he was interested in purchasing it. See People v. Cathron, No. 202104, 2000 WL 33522357, **1, 6 (Mich.App. Mar. 7, 2000).

Petitioner was sentenced to a term of twenty to fifty years in prison for each armed robbery, ten to twenty years for home invasion, and three to five years for receiving and concealing stolen property. All the sentences run concurrently.

On appeal to the Michigan Court of Appeals, Petitioner initially argued through counsel that (1) the trial court abused its discretion by admitting Jemien Jones' hearsay testimony about Stephen Terry's statement to him and (2) there was insufficient evidence established at trial to support the convictions. In a supplemental brief filed by a different attorney, Petitioner argued that (1) defense counsel's failure to call alibi witnesses deprived him of effective assistance; (2) defense counsel's failure to object to hearsay testimony deprived him of effective assistance; (3) he was denied his constitutional right to be present at a critical stage of the proceedings; and (4) defense counsel's failure to request an instruction on accessory after the fact deprived him of effective assistance. The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished per curiam opinion. See id.

Petitioner appealed through counsel to the Michigan Supreme Court. He raised the issues that he had asserted in his supplemental brief before the court of appeals. He also incorporated by reference and by means of an attachment the issues that his first appellate attorney had raised in the court of appeals. The supreme court denied leave to appeal. See People v. Cathron, No. 116564, 2000 WL 1205846 (Mich. Aug. 22, 2000).

Petitioner signed and dated his habeas petition on November 16, 2000. The grounds for relief read as follows:

I. THE TRIAL JUDGE ABUSED HIS DISCRETION BY ALLOWING ADMISSION OF HEARSAY EVIDENCE IN THE FORM OF A

STATEMENT MADE BY A CO-DEFENDANT.

II. DEFENDANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEY'S FAILURE TO CALL HIS ALIBI WITNESSES AT HIS SECOND TRIAL

III. DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEY'S FAILURE TO OBJECT TO THE INTRODUCTION OF HEARSAY TESTIMONY ON THE GROUNDS THAT THE DECLARANT WAS NOT UNAVAILABLE AND BY COUNSEL'S FAILURE TO REQUEST A LIMITING INSTRUCTION

IV. WAS DEFENDANT DENIED HIS CONSTITUTIONAL RIGHT TO BE PRESENT AT A CRITICAL STAGE OF THE PROCEEDINGS?

V. DID TRIAL COUNSEL'S FAILURE TO REQUEST AN INSTRUCTION ON THE LESSER OFFENSE OF ACCESSORY AFTER THE FACT DENY DEFENDANT HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL?

(Habeas Pet., 5, 5A, 5B, & 6A).

 Petitioner is entitled to habeas relief only if he can show that the state court's adjudication of his claims on the merits—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under the "contrary to" clause of § 2254(d)(1),

a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

## II. *Discussion*

### A. *The Exhaustion Doctrine*

 The doctrine of exhaustion of state remedies requires state prisoners to fully and fairly present their claims to the state courts as a matter of federal law before raising those claims in a federal habeas corpus petition. 28 U.S.C. § 2254(b)(1)(A) and (c); *O'Sullivan v. Boerckel,* 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Stanford v. Parker,* 266 F.3d 442, 451 (6th Cir.2001). The exhaustion requirement is satisfied if a prisoner invokes one complete round of the State's established appellate review process, including a petition for discretionary review to a state supreme court. *O'Sullivan,* 526 U.S. at 839–40, 845, 119 S.Ct. 1728.

Respondent contends that Petitioner did not raise his first claim in the Michigan Supreme Court and that the claim is procedurally defaulted because Petitioner no longer has an available remedy to exhaust. A close review of the record indicates that Petitioner incorporated his first claim in his application for leave to appeal before

the Michigan Supreme Court. He specifically asked the Supreme Court to review the issues raised in his previous attorney's brief, and he attached his previous attorney's brief to his application before the supreme court. Thus, he raised all five of his habeas claims in both state appellate courts.

However, he did not raise his first habeas claim as a federal constitutional issue in either the court of appeals or the supreme court. Thus, the first habeas claim is not exhausted and the habeas petition is a mixed petition of one unexhausted claim and four exhausted claims.

■ Normally, if a prisoner fails to exhaust state court remedies for even one claim, the Court must dismiss the entire petition. *See Lyons v. Stovall*, 188 F.3d 327, 333 (6th Cir.1999) (citing *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982)), *cert. denied*, 530 U.S. 1203, 120 S.Ct. 2197, 147 L.Ed.2d 233 (2000). The failure to exhaust state remedies is not an absolute bar when the claims are plainly meritless and it would be a waste of time and judicial resources to require exhaustion. *Id.* None of Petitioner's claims warrant habeas relief. Therefore, in the interest of comity and federalism, the Court will address Petitioner's claims rather than require additional court proceedings. *See id.*[1]

### B. *Hearsay*

Petitioner's first claim alleges that the trial court abused its discretion by allowing hearsay testimony to be admitted into evidence. Petitioner argues that the trial court erred in ruling that the declarant's statements were admissible under Michigan Rule of Evidence 804(b)(3) (declarations against penal interest).

■ The Court may grant the writ of habeas corpus only if the petitioner is in custody in violation of federal law. 28 U.S.C. §§ 2241(c)(3), 2254(a). Petitioner's first claim alleges merely a violation of state law, and the Court may not grant the writ on the basis of a perceived error of state law. *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Accordingly, Petitioner's first claim is not cognizable on habeas review.

### C. *Alleged Ineffective Assistance of Trial Counsel*

Petitioner alleges in his second, third, and fifth habeas claims that he was deprived of his constitutional right to the effective assistance of trial counsel. The Michigan Court of Appeals analyzed Petitioner's claim under the Sixth Amendment and concluded that Petitioner received constitutionally effective assistance.

■ To prevail on his claim, Petitioner must show that the state court's conclusion was contrary to, or an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* established a two-prong test for claims of ineffective assistance of counsel: the petitioner must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. 2052.

■ The proper standard for attorney performance is "reasonably effective assistance." *Id.* Petitioner must demonstrate that his attorney's "representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. The prejudice prong requires demonstrating "a

---

**1.** Furthermore, although Petitioner could return to state court and raise his first claim as a federal constitutional issue in a post-conviction motion, the state courts likely would find that Petitioner had already raised the substance of his claim on direct review or that he should have done so. *See* Mich.Ct.R. 6.508(D)(2) & (3).

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Furthermore, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052.

### 1. *Habeas Claim Two—Failure to Call Alibi Witnesses*

Petitioner alleges that defense counsel should have produced two alibi witnesses at the second trial. Petitioner claims that the witnesses would have established that he was at home during the home invasion and robbery. In addition, Petitioner contends that the witnesses would have corroborated his explanation for being in the abandoned house immediately before his arrest. Because the alibi witnesses testified at Petitioner's first trial, which ended in a hung jury, Petitioner believes that the result of his second trial would have been different had his attorney called the witnesses. Petitioner also contends that there was no sound trial strategy for not calling the witnesses.

The Michigan Court of Appeals disagreed, noting that

[a]t [Petitioner's] first trial, alibi witnesses Shurmyra Love and Camille Powell, [Petitioner's] fiancee, testified that [Petitioner] left his house on foot the day of the crimes in order to look at a nearby house. [Petitioner] was wearing a brown shirt, brown corduroy pants, brown shoes, and a brown coat, not a blue-jean jacket.

Both of these witnesses' credibility was impeached at the first trial by their testimony that they only recently decided to come forward with an explanation

for [Petitioner's] whereabouts that day. Love was obviously confused about the date in question and admitted that she had not come forward with [Petitioner's] alibi until the week of trial, and Powell's testimony that she did not testify on [Petitioner's] behalf at the preliminary examination because she was unaware of the charges against him was weak. Defense counsel, as a matter of trial strategy, could have decided that their testimony would not aid [Petitioner's] case because of the witnesses' lack of credibility. The testimony of the owner of the vacant house supported to an extent [Petitioner's] version of the facts. The owner testified that someone had made inquiries about buying his house and that he had indicated he would sell it for $2,500. [Petitioner] was correct when he testified that the purchase price was $2,500 with $1,000 in back taxes.

*Cathron,* 2000 WL 33522357, *8.

The court of appeals concluded that, "given the disinterested testimony of the owner, ... the failure to call the two women did not result in [Petitioner] being deprived of a substantial defense. Therefore, [Petitioner] did not receive ineffective assistance of counsel for counsel's failure to call Love and Powell." *Id.*

Petitioner alleges that the state court falsely assumed that defense counsel's failure to call the witnesses was a strategic decision. Petitioner contends that the alibi witnesses were not obligated to contact the police before trial and that defense counsel should have pointed that out to the jury.

Although the alibi witnesses were not required to contact the authorities, the prosecutor was not prohibited from asking them about their failure to come forward earlier. *See People v. Phillips,* 217 Mich. App. 489, 492–96, 552 N.W.2d 487 (1996). In any event, the alibi testimony was weak

for reasons unrelated to the witnesses' failure to come forward earlier.

Shurmyra Love testified at one point that she saw Petitioner at his home on February 5, 1996, and that Petitioner left home about 4:50 p.m. to see a house on Lawndale Street. The crimes occurred on February 6, 1996, and Petitioner testified that he went to see a house on Milbourn Street.

In addition, Love did not know what day of the week she had seen Petitioner, and she could not remember whether she had gone to Petitioner's house the week before, although she claimed that she went there on most week days. She was unable to articulate why she remembered the particular day in question. Defense counsel had to put words in her mouth on re-direct examination, explaining that the day in question was memorable because Petitioner was arrested on that day. (Habeas Pet., Appendix A, 403–14).

Camille Powell was more articulate, but she risked being perceived as biased because she was Petitioner's fiancee. In addition, on direct examination, she started to say that Petitioner left home about 5:00 p.m. on February 6, 1996, to see a house on Moore Street. She caught her error and quickly changed the name of the street to Milbourn. When asked if Petitioner left by car, she said, "Yeah," but then said, "No, he walked." This was a critical point because Petitioner was charged with receiving and concealing a stolen car and with aiding and abetting the other crimes by being the driver of the getaway car.

Furthermore, Powell testified that she was living with Petitioner on February 6, 1996, but that she did not attend Petitioner's preliminary examination in February of 1996 and that she could not remember "back then." She also did not know the nature of the charges against Petitioner, except that he was charged with aiding and abetting. (Habeas Pet., Appendix A, 415–24).

▮▮▮ The Court agrees with the state court that, given the weakness of the alibi witnesses' testimony at the first trial, it was reasonable trial strategy not to call them as witnesses at the second trial. Defense counsel did put Stephen Terry on the stand. Terry testified that he and someone other than Petitioner committed the crimes and that Petitioner was not involved in them. Petitioner has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

▮▮▮ Petitioner also has not shown that, but for defense counsel's failure to call the alibi witnesses, the result of his trial would have been different. The second trial may have ended differently because he had different jurors, not solely because of the absence of alibi witnesses. In addition, Teika Thomas testified for the first time at Petitioner's second trial that, after the robbery, Petitioner tried to bribe her into not testifying against him. She claimed that she did not testify about the bribe at any previous court proceedings because she was afraid of Petitioner and of what he might make his friends do. She explained that she was testifying about the attempted bribe for the first time at Petitioner's second trial because she wanted him to go to jail for what he did. (Tr. II, 228–30, 245–46).

The state court concluded that defense counsel was not ineffective for failing to call the alibi witnesses and that the failure to call the alibi witnesses did not deprive Petitioner of a substantial defense. For the reasons given above, the state court's conclusion was not contrary to, or an unreasonable application of, *Strickland*, and

Petitioner is not entitled to habeas relief on the basis of his second claim.

### 2. *Habeas Claim Three – Defense Counsel's Failure to Object to Hearsay Testimony*

■ Petitioner alleges next that his trial attorney should have objected to Jemein Jones' testimony that Stephen Terry told him about the robbery and said that "Drey" was one of his accomplices. Petitioner alleges that this testimony was inadmissible hearsay because, even though Terry's statement was against his (Terry's) penal interest, he was available to testify. Petitioner contends that the trial court made no finding, as required by Mich.R.Evid. 804(a), that Terry was unavailable. Therefore, alleges Petitioner, the exception to the hearsay rule for statements against penal interest, Mich.R.Evid. 804(b)(3), was not applicable.[2]

It is important to realize that defense counsel did make a timely objection to Jemein Jones' testimony about what Stephen Terry allegedly told him. He argued that the testimony was inadmissible hearsay and that it was not reliable. He did not make the specific objection that the prosecution failed to prove Terry's unavailability.

Terry, in fact, was called to testify as a defense witness at Petitioner's second trial. He testified that he and someone named Shamoo committed the robbery and home invasion. He also testified that there was no third party involved in the crimes, that Petitioner was not Shamoo, and that he did not see Petitioner on February 6, 1996. However, it was not known

for certain until just before Terry testified that he would actually testify.[3] Jemein Jones had already testified by then about Terry's comments to him.

■ Even assuming that everyone knew Stephen Terry would testify at the second trial, the prosecutor could have impeached Terry with his prior inconsistent statements to Jemein Jones if Jones' hearsay testimony had been ruled inadmissible. *See* Mich.R.Evid. 613. "[E]vidence of a prior inconsistent statement of the witness may be admitted to impeach a witness even though the statement tends directly to inculpate the defendant." *People v. Kilbourn,* 454 Mich. 677, 682, 563 N.W.2d 669 (1997) (citing *United States v. Miller,* 664 F.2d 94 (5th Cir.1981)). A narrow exception to this rule was established in *People v. Stanaway,* 446 Mich. 643, 521 N.W.2d 557 (1994). *Id.* at 682–83, 563 N.W.2d 669.

> The rule set forth in *People v. Stanaway* is that the impeachment should be disallowed when (1) the substance of the statement purportedly used to impeach the credibility of the witness is relevant to the central issue of the case, and (2) there is no other testimony from the witness for which his credibility was relevant to the case.

*Id.* at 683, 563 N.W.2d 669.

The substance of Stephen Terry's statements to Jemein Jones was relevant to the central issue of whether Petitioner was involved in the armed robbery and home invasion. However, Stephen Terry gave other testimony for which his credibility

---

**2.** Petitioner also contends that his attorney should have requested a cautionary jury instruction. However, he has not said which jury instruction his attorney should have requested.

**3.** Although defense counsel had subpoenaed Terry, he asked the trial court in the jury's

absence to determine whether Terry would testify. Terry was then given a chance to consult with an attorney and asked if he intended to testify. He assured the trial court that he wanted to testify, and an offer of proof was made as to his intended testimony. (Tr. III, 369–87).

was relevant. For example, Terry testified that he and Shamoo went to the victims' home to collect a drug debt from "Dionco" and that there was crack cocaine in the victims' home. Terry also testified that there was no third party involved in the crime and that a police officer had tried to convince him not to testify. These allegations and other testimony by Terry contradicted the testimony of prosecution witnesses.

To summarize, there was other testimony for which Terry's credibility was relevant, and Jemein Jones' testimony would have been admissible to impeach Terry's credibility. Petitioner has not shown that, but for defense counsel's alleged error, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Therefore, the state court's conclusion that defense counsel's omission did not affect the result of the case was a reasonable application of *Strickland.*

### 3. *Habeas Claim Five – Defense Counsel's Failure to Request a Jury Instruction on Accessory after the Fact*

Petitioner was charged as an aider and abettor to the armed robbery and home invasion. He was charged as the principal person to receive and conceal the stolen car, which was used to commit the robbery and home invasion.

■ Petitioner's final claim about defense counsel is that his attorney failed to request a jury instruction on the lesser offense of accessory after the fact. Petitioner argues that an instruction on accessory after the fact would have been appropriate because, if the jury believed Officer Daniel Mata's testimony, Petitioner merely drove the stolen car containing the stolen property and arguably helped to dispose of the property.

■ The Michigan statute on aiding and abetting provides that:

> Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

MICH.COMP.LAWS § 767.39. " 'Aiding and abetting' describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deed that might support, encourage, or incite the commission of a crime." *People v. Turner,* 213 Mich.App. 558, 568, 540 N.W.2d 728 (1995).

■ In contrast, "[a]n 'accessory after the fact' . . . is 'one who, with knowledge of the other's guilt, renders assistance to a felon in the effort to hinder his detection, arrest, trial or punishment.' " *People v. Lucas,* 402 Mich. 302, 304, 262 N.W.2d 662 (1978) (quoting Perkins, Criminal Law (2d ed.), p. 667). Accessories after the fact, by definition, do not participate in the charged offense either as a principal or as an aider or abettor, and they do nothing in furtherance of the offense before or while it occurred. *People v. Perry,* 218 Mich. App. 520, 534, 536 n. 3, 554 N.W.2d 362 (1996). An accessory after the fact has no causal role in the principal offense. *Id.* at 536 n. 3, 554 N.W.2d 362.

The testimony elicited in this case suggested that Petitioner planned the armed robbery and home invasion and drove the getaway car. Because the evidence indicated that Petitioner incited, encouraged, and assisted in the robbery and home invasion, an instruction on accessory after the fact would have been inappropriate. Even if it were appropriate, the instruction would have contradicted and undermined Petitioner's defense that he was elsewhere during the crimes and had no involvement in them. For these reasons, the state court's conclusion—that defense counsel

was not ineffective for failing to request a jury instruction on accessory after the fact—was not contrary to, or an unreasonable application of, *Strickland.*

#### D. *Right to be Present*

Petitioner's fourth claim is that he was deprived of his constitutional right to be present at a critical stage of the proceedings. Petitioner asserts that, during the jurors' deliberations, they asked to hear Jemein Jones' testimony. As further explained by the Michigan Court of Appeals,

> [t]he transcript indicates that the jury asked several questions regarding Jones' testimony, but the questions are not transcribed or preserved in the record. The transcript reveals that the attorneys played Jones' testimony for themselves and wrote out answers to the jury's questions verbatim.[4]

*Cathron,* 2000 WL 33522357, *10 (footnote in original). Petitioner claims that he was absent during this incident and that he could not have waived his right to be present because he was not informed of the right.

■■■ The Supreme Court has held that "the right to personal presence at all critical stages of the trial ... [is a] fundamental right[ ] of each criminal defendant." *Rushen v. Spain,* 464 U.S. 114, 117, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). The Supreme Court "has never addressed whether readback of testimony to a jury is a 'critical stage[ ] of the trial' triggering a criminal defendant's fundamental right to be present. Nor has the [Supreme] Court

considered any case with 'materially indistinguishable facts.' " *LaCrosse v. Kernan,* 244 F.3d 702, 708 (9th Cir.2001). Nevertheless, a state court decision may involve an unreasonable application of Supreme Court precedent "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407, 120 S.Ct. 1495.

The Michigan Court of Appeals recognized the constitutional right to be present at critical stages, but it determined that the answers to the jurors' questions contained Jones' own words and should be considered a mere read-back. The court of appeals found the read-back permissible under state law. The court of appeals concluded that Petitioner was not prejudiced by the alleged error, nor deprived of his constitutional right to be present during a critical stage of the trial.

■■■ This conclusion was objectively reasonable because the Constitution does not require the defendant to be present when "presence would be useless, or the benefit but a shadow." *Snyder v. Massachusetts,* 291 U.S. 97, 106–07, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled on other grounds by Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). "[T]he presence of the defendant [is] largely a matter of form when a defendant's lawyer is present at proceedings raising

---

4. Following the return of the verdict, there was a discussion regarding jury questions and responses:

> MR. PETRIDES [the prosecutor]: If I could just briefly make a record of the questions. I believe there was one question that you consulted Mr. Beauvais and I about and— as to testimony—and sent that answer back in. And that's on paper. And the second one, answers were drafted by Mr. Beauvais

and I after we listened to the tape here in the courtroom, and that was sent back in there to the jury.

> . . . . .

> Mr. BEAUVAIS [defense counsel]: For the record, Judge, that is correct. And the testimony that we listened to—it was written down word for word from the testimony as to the answers to those questions.

largely legal issues...." *Fisher v. Roe,* 263 F.3d 906, 916 (9th Cir.2001).

Although Petitioner alleges that he was not personally present at the readback, his attorney was present. Defense counsel, in fact, participated in drafting a response to the jurors' question. The response apparently was a verbatim rendition of the requested testimony. Given these facts, the Court cannot say that the decision of the Michigan Court of Appeals was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. *See LaCrosse,* 244 F.3d at 708; *cf. Fisher,* 263 F.3d at 916 (finding an unreasonable application of clearly established federal constitutional law where neither the defendants, nor their lawyers were present or aware of the readback). Accordingly, Petitioner's fourth claim lacks merit.

### III. *Conclusion*

For all the reasons given above, the Court concludes that Petitioner has not shown entitlement to habeas relief. Therefore, Petitioner's application for the writ of habeas corpus is **DENIED.**