Andre CATHRON, Petitioner–Appellant,

v.

Kurt JONES, Warden, Respondent–Appellee.

No. 02–1296.

United States Court of Appeals, Sixth Circuit.

Oct. 2, 2003.

BEFORE: SUHRHEINRICH, COLE, and ROGERS, Circuit Judges.

## OPINION

COLE, Circuit Judge.

Petitioner Andre Cathron appeals the district court's denial of his petition for a writ of habeas corpus based on ineffective assistance of counsel. Petitioner claims that counsel was ineffective for failing to: (1) present two alibi witnesses, (2) object to certain hearsay testimony on grounds that the declarant had not been shown to be unavailable, and (3) request that an accessory-after-the-fact instruction be given to the jury. For the reasons that follow, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Petitioner Andre Cathron was charged under Michigan law with two counts of armed robbery, first-degree home invasion, and receiving stolen property over $100. These charges arose out of a robbery of the Flint, Michigan home of Connie and Teika Thomas that occurred between 4:00 and 4:30 p.m. on February 6, 1996. At trial, the prosecution's theory of the case was that three men, Petitioner, Stephen Terry, and another man, went to the Thomas home in a stolen car. *People v. Cathron*, 2000 WL 33522357, at *1 (Mich.Ct.App. Mar.7, 2000). Terry and the unknown accomplice entered the Thomas home "forcibly, held a gun on the victims, ransacked the house, stole various items from it, loaded them in the stolen car, and with [Petitioner] driving, drove away." *Id.* Petitioner's theory was that he had nothing to do with the crimes at issue, and that he was merely in the wrong place at the wrong time. *Id.*

In 1996, Petitioner and his co-defendant Terry were tried together. Terry was convicted of armed robbery, first-degree home invasion, and possession of a firearm during the commission of a felony. The

jury was unable to reach a decision about Petitioner, who was tried on the theory that he had aided and abetted the robbery.

In 1997, Petitioner was re-tried, again on an aiding and abetting theory. On January 31, 1997, Petitioner was convicted of the charges against him and sentenced to serve concurrent terms of twenty to fifty years, ten to twenty years, and three to five years, respectively, for these convictions.

The Michigan Court of Appeals described the evidence at Petitioner's second trial as follows:

The victims, Connie Thomas and her teenage daughter, Teika, lived together. Connie Thomas testified that two men came to the door holding inflated helium balloons and asked for Teika by name. She believed that the balloons were for her, her birthday having been two days earlier. As Teika approached the door, the men forced their way into the house, held a gun to the victims, tied the victims up, ransacked the house, and took various items, including televisions and jewelry. Both victims testified that they did not recognize the two men who robbed them, but that the robbers knew them by name. Teika testified that she had known defendant for a time before the robbery, and that defendant had come to her house to see her several times in the weeks before the robbery. Connie Thomas had met defendant on one of the occasions outside the house, when it was dark, and for a short time. She testified that Teika had introduced him as "Drey." Teika testified that a couple of days after the robbery and after defendant was in jail, a friend of hers called her and there was a three-way conversation with defendant, during which defendant tried to bribe her not to testify against him by offering her money and one of his cars. Teika testified that she had not previously reported this conversation because she was scared of defendant.

Officer Mata testified that while on routine patrol around 5:00 p.m. on February 6, 1996, he and his partner, Officer Peck, spotted a 1978 Grand Prix matching the description of a car listed on their hot sheet as stolen, that the license plate matched the stolen vehicle's, and that he turned the patrol car around and pursued the stolen vehicle. He observed the car stop and three men jump out, two from the passenger side went in one direction, and one from the driver's side went in another direction. His focus was on the person who jumped out of the car from the driver's side, who was wearing a jean jacket. Mata pursued the man on foot and within one minute came upon a vacant house [at 2019 Milbourn in Flint, Michigan] and heard noises from within that sounded like someone running and falling. Defendant emerged from the back door, which was open, breathing hard, like he had been running, and surprised to see the officer. Following defendant's arrest, Mata found a blue denim coat behind the garage of the vacant house. Mata testified that water pipes in the house had broken and water was running down from the upstairs bathroom had formed ice on the kitchen floor.

Officer Peck testified similarly, but was unsure whether one or two passengers emerged from the passenger side of the stolen vehicle. When Peck inspected the Grand Prix, he found a number of items that he later learned had been taken from the Thomas' home, and some helium balloons.

Defendant denied involvement in the alleged incidents and testified that he was at the vacant house where he was arrested because he was interested in purchasing the house, which was being sold for $2,500. He testified that he did

not have permission to go inside but did so when he saw the door was open. The prosecution called the owner of the vacant house in rebuttal, who testified that he had received some inquiries about the house, and had told one caller that he would be willing to sell for $2,500, but could not specify when he had spoken to that person.

*Id.* at *6–*7.

Additionally, over Petitioner's objections, based on hearsay and lack of reliability, the prosecution introduced the testimony of Jamein Jones that Terry had told him that Terry and someone named "Drey" had committed the robbery. Specifically, Jones testified as follows:

A: He told me that him [sic] and his friend, his two friends, had—had hit a lick. They had robbed—robbed—set up a robbery.

Q: Okay. Did he use the name of either of his two friends?

A: Yes.

Q: What did he—what did he say?

A: I—I just remember one name. I can't remember the other.

Q: What name do you remember?

A: Drey.

* * *

Q: What did he say?

A: He said that—what did he say? He said they went to a flower shop or balloon shop or somethin', and got some balloons. Went over to the house and Steve knocked on the door. And when they opened the door that he had pulled out the gun, you know. He said that he had tied the lady up and Drey had took the young girl in the back room. And ... let's see. I don't know. That's about it.

*Id.* at *3.

However, convicted co-defendant Terry testified that Petitioner was not involved in the robbery at all. *Id.* at *4. Terry testi-fied that he and one other man, an individual named Shamoo, who happened to be Jones's cousin, had committed the crimes. *Id.* The Michigan Court of Appeals described Terry's testimony as follows:

[Terry] testified that [Jamein] Jones was a cousin or relative of the man with whom Terry committed the robbery, someone named Shamoo. Terry testified that he and Shamoo went to the home to collect a debt owed to Shamoo by someone named Dionco. Connie Thomas answered the door, said Dionco was not there and that she did not know where his money was. Shamoo and Terry searched the house and removed televisions and other items. Terry testified that he was wearing a blue denim jacket, that he drove the car, that he ran from the car when he saw the police car following them, that the jacket got caught on a fence as he was fleeing and he abandoned it, and that he hid in a garage for several hours. Terry testified that after leaving the hiding place, he went to Jamein Jones', and that Shamoo was already at Jones' when he arrived. He further testified that defendant was not with him. On cross-examination, Terry testified that he had not testified at his trial and was convicted of committing the house robbery of the Thomases. Terry testified that he had told Sergeant Wright about Shamoo, but had not told him that he had been driving the getaway car because his attorney had advised him not to. Terry denied that a third person was involved in the robbery and admitted that he said nothing at his sentencing regarding defendant not being involved. Terry testified that Sergeant Wright had tried to influence him not to let defendant get off.

*Id.*

At Petitioner's first trial, two alibi witnesses, Camille Powell and Shurmyra

Love, testified. Both testified that Petitioner, who was home between 2:30 p.m. and 4:50 p.m. on the day in question, had left his home just before 5:00 p.m., to walk to a house he was interested in buying. Both testified that Petitioner was wearing a brown coat, and Powell testified that she later picked up the brown coat at the jail. Both testified that Petitioner was not driving a black Pontiac Grand Prix and was not with Terry. However, neither Love nor Powell testified at Petitioner's second trial. Thus, at the second trial, the only evidence of Petitioner's alibi was provided by his own testimony, the testimony of the owner of the house that someone had called and inquired about the asking price of the home, and Terry's testimony. The owner could not corroborate Petitioner's alibi that Petitioner had visited the home around 5:00 p.m. on February 6.

On March 7, 2000, the Michigan Court of Appeals denied Petitioner relief on the three claims raised on this appeal, among other grounds. *People v. Cathron*, 2000 WL 33522357, at *1. On August 22, 2000, the Michigan Supreme Court denied Petitioner's application for leave to appeal the March 7 decision of the Michigan Court of Appeals. *People v. Cathron*, 463 Mich. 860, 617 N.W.2d 556 (Mich.2000). Subsequently, on November 16, 2000, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). On February 15, 2002, the district court issued an order denying relief. This timely appeal followed.

## II. ANALYSIS

■ Relying on the Michigan Court of Appeals' findings of fact, the district court denied all of Petitioner's claims. *Cathron v. Jones*, 190 F.Supp.2d 990, 992 (E.D.Mich.2002). First, the district court concluded that trial counsel was not ineffective for failing to call two alibi witnesses to testify at Petitioner's second trial because, as the Michigan Court of Appeals

concluded, this was reasonable trial strategy given the weaknesses in the alibi witnesses' testimony and credibility, and the fact that Terry testified at the second trial. *Id.* at 997–99. Moreover, the district court found that Petitioner could not demonstrate that with the testimony of these witnesses the outcome of his second trial would have been different because of, among other things, Teika Thomas's testimony that Petitioner had attempted to bribe her. *Id.* at 998. Second, the district court concluded that trial counsel was not ineffective for failing to object to testimony by Jones that Terry told him that "Drey" was one of his accomplices because counsel did in fact object, although not specifically to Terry's unavailability. *Id.* at 999. Moreover, the district court concluded that because Terry was called to testify, Jones's testimony would have been available to impeach Terry, so no prejudice resulted from the admission of Jones's hearsay testimony. *Id.* at 999–1000. Third, the district court concluded that trial counsel was not ineffective for failing to request an accessory-after-the-fact instruction because the evidence did not support such an instruction and, if given, it would have undermined Petitioner's alibi defense. *Id.* at 1000–01. The district court denied the remainder of Petitioner's claims. *Id.* at 996, 1001–02.

In reviewing a district court's decision to grant or to deny a petition under § 2254, we review all questions of fact for clear error, and consider all questions of law *de novo*. *Carson v. Burke*, 178 F.3d 434, 436 (6th Cir.1999).

The Petition was filed after April 24, 1996, the effective date of the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"); thus, it is subject to AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 323, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (holding AEDPA applicable to peti-

tion filed on or after AEDPA's effective date). In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court interpreted the standard for reviewing a petition for writ of habeas corpus under AEDPA.[1] In particular, the Court explained that a state court decision can be "contrary to" the Supreme Court's precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the result reached by the Supreme Court]." *Id.* at 405, 120 S.Ct. 1495. A state court decision may be an unreasonable application of clearly established Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases, but unreasonably applies it to the facts of the particular ... case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407, 120 S.Ct. 1495.

The Michigan Court of Appeals decided that Petitioner received effective assistance of counsel. To prevail on his ineffective-assistance claim here, Petitioner must show that the decision of the Michigan Court of Appeals was contrary to, or an unreasonable application of, the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland*, a finding that trial counsel was constitution-

ally ineffective is only appropriate if the following is demonstrated:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. To show that counsel's performance was deficient, Petitioner must show that the trial counsel's representation "fell below an objective standard of reasonableness," that is, that counsel's performance was unreasonable when measured against the "prevailing professional norms." *Id.* at 688. To show prejudice, Petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. When reviewing an ineffective-assistance-of-counsel claim, this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

---

**1.** The AEDPA standard is set out in 28 U.S.C. § 2254(d)(1), which provides:

> An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court

proceedings unless the adjudication of the claim ... resulted in a decision that was contrary to, or an involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States....

## A. Failure to Call As Alibi Witnesses Love and Powell

First, Petitioner argues that trial counsel was ineffective for failing to call Love and Powell to testify as alibi witnesses at his second trial. At Petitioner's first trial, Shurmyra Love, a fifteen-year-old girl, testified that on February 5, 1996, she arrived at Petitioner's home at approximately 2:30 p.m., that Petitioner was home at that time, and that when she and Petitioner left his home together at 4:50 p.m., he was wearing brown boots, corduroy pants, shirt and jacket. *Cathron*, 190 F.Supp.2d at 997–98. Petitioner, who was walking, was going to "see about a house." *Id.* On cross-examination, Love testified that she did not know what day of the week it was, but that it occurred "on the 5th." *Id.* On redirect, however, Love testified that she remembered what day it was because it was the day that Petitioner was arrested. *Id.* Love also testified on cross-examination that she had not spoken to the police about Petitioner's whereabouts, but had spoken to defense counsel for the first time that week. *Id.*

Camille Powell, Petitioner's fiancee, testified that Petitioner was home with her (and Love and another man) on the day in question, but, "just before five o'clock," he walked around the corner to "Moore—Milbourn—Street, aroun' the corner from me, so he could look at a house." *Id.* Powell testified that Petitioner was wearing brown shoes, shirt, pants and coat and produced the brown coat, which she claimed she had retrieved from the jail in which Petitioner was held. *Id.* Powell also testified that Petitioner does not own a blue denim coat. *Id.* Powell also testified that Petitioner was not known as "Drey." *Id.* On cross-examination, Powell testified that she only knew that Petitioner was charged with aiding and abetting, but that she did not know what that charged entailed. *Id.*

The Michigan Court of Appeals concluded that Petitioner had not overcome the presumption that trial counsel's decision not to call Love and Powell was trial strategy because counsel "could have decided that their testimony would not aid [Petitioner's] case because of the witnesses' lack of credibility." *Cathron*, 2000 WL 33522357, at *8.

Petitioner argues that because the evidence against him was circumstantial, the alibi witnesses were critical to his defense. Petitioner points to the facts that: (1) no eyewitnesses placed him at the robbery; (2) Terry testified that Petitioner was not involved in the planning or execution of the robbery; (3) the victims testified that they were robbed by two people, and that neither of the two was Petitioner; (4) Petitioner had talked to the owner of the vacant house before the robbery; (5) Connie Thomas testified that there were only two people in the car when it came to her house; (6) the police described the driver of the car as a black male wearing a blue denim jacket and Terry testified that he was wearing a blue denim jacket and Teika Thomas corroborated this.

Under *Strickland*, we must presume that decisions of what evidence to present and whether to call or question witnesses are matters of trial strategy. *See Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002). We have previously held that the failure by counsel to either investigate or interview promising witnesses constitutes negligence, not trial strategy. *See Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir.1992). However, in the present case, counsel was aware of both Love and Powell, and knew precisely to what each would testify and how credible each was as a witness, having seen them both on the stand at Petitioner's first trial. Given counsel's knowledge of these alibi witnesses, we presume that counsel's decision

to omit their testimony was trial strategy. *See United States v. Foreman,* 323 F.3d 498, 503 (6th Cir.2003) (finding failure to call an alibi witness was reasonable trial strategy where counsel had a reasonable basis to believe that the witness's testimony was fabricated and that such fact would be exposed on cross-examination, especially given that the defendant had already offered the alibi on the witness stand). Moreover, trial counsel did present Petitioner's alibi defense, through Petitioner's own testimony, as well as the disinterested testimony of the owner of the house, and the testimony of Terry. Counsel could have reasonably concluded, as a matter of trial strategy, that the testimony of Love and Powell, both friends of Petitioner, would have added little given that the success of the alibi defense would likely turn in large measure on whether the jury believed Petitioner. Because Petitioner's claim fails on the first prong of *Strickland,* we decline to address whether Petitioner can establish that he was prejudiced by counsel's decision.

## B. Failure to Object Based on the Unavailability of the Declarant

■ Next, Petitioner claims that counsel was ineffective for failing to object to the admission of Jones's testimony that Terry told him that Terry and "Drey" committed the robbery based specifically on Terry's unavailability.[2] Although counsel's failure to make this specific objection resulted in the challenge to the admission of Jones's testimony not being preserved for appeal, the Michigan Court of Appeals concluded that "because Terry actually testified in defendant's favor and Jones's testimony would have been admissible for impeachment purposes, ... counsel's failure to object on the grounds of failure to establish unavailability did not affect the result of the case."[3] *People v. Cathron,* 2000 WL 33522357, at *8. Thus, the Michigan Court of Appeals concluded that Petitioner could not demonstrate prejudice as a result of trial counsel's failure to object to the admission of hearsay testimony by Jones specifically on grounds that Terry, the declarant, was unavailable. *Id.*

First, we must assess whether counsel's conduct "fell below an objective standard of reasonableness," or was unreasonable when measured against the "prevailing professional norms." Trial counsel erred in failing to object to the admission of Jones's statement under Michigan Rule of Evidence 804 on the grounds that the prosecution had not demonstrated that Terry was unavailable to be questioned on his statement himself. As noted previously, Rule 804 requires unavailability. *See* Mich. R. Evid. 804. Because counsel did object to the admission of the statement generally, but failed to object on the specific ground that the prosecution had not demonstrated that Terry was unavailable,

2. Notably, Petitioner does not raise a claim that Michigan evidentiary law was improperly applied, nor does Petitioner claim that his Sixth Amendment Confrontation Clause rights were violated.

3. Jones's testimony regarding the hearsay statement of Terry was admitted as a statement against interest under Michigan Rule of Evidence 804, which provides an exception to the hearsay hearsay bar for statements against the declarant's penal interest. This rule requires that the declarant be unavailable. On direct appeal, the Michigan Court of Appeals concluded that, because trial counsel failed to object to the admission of the statement on grounds that the prosecution had failed to establish the unavailability of Terry, the question whether the trial court abused its discretion in admitting the statement was waived. *Id.* at *5. Moreover, the Michigan Court of Appeals concluded that any error was at best harmless because Terry did in fact testify and was available for cross-examination.

it is clear that counsel was not employing a trial strategy.

While counsel should have objected specifically on grounds of unavailability to the admission of this evidence, we do not find that counsel's failure to object was so unreasonable that he was not functioning as counsel guaranteed by the Sixth Amendment. The failure to take proper steps to exclude highly damaging evidence may constitute ineffective assistance or deny a defendant a fair trial. However, in the present case, counsel did object to the admission of this evidence at both trials, and both times, the trial court admitted the testimony over his objections.

With regard to the prejudice prong of *Strickland*, the district court concluded that even if Jones had been prevented from testifying, his testimony could have been used to impeach Terry's testimony so any error was harmless. We conclude that it is not clear that this statement could have been used to impeach Terry and, even if the statement was admitted for impeachment purposes, it could not, under those circumstances, be used by the jury as substantive evidence of guilt.

First, it is not clear that Jones's statement would be admissible under Michigan Rule of Evidence 613(b), which governs the use of inconsistent out-of-court statements for impeachment purposes. This rule provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same . . . ." Generally,

> [E]vidence of a prior inconsistent statement of the witness may be admitted to impeach a witness even though the statement tends directly to inculpate the defendant. *People v. Stanaway* provided an exception to this rule: A prosecutor cannot use a statement that directly tends to inculpate the defendant under the guise of impeachment when there is no other testimony from the witness for which his credibility is relevant to the case.

*People v. Kilbourn*, 454 Mich. 677, 682, 563 N.W.2d 669 (Mich.1997) (discussing *People v. Stanaway*, 446 Mich. 643, 521 N.W.2d 557 (Mich.1994) and explaining that a prior statement that is relevant to the central issue in the case cannot be used to impeach a witness on the only issue for which that witness's credibility is relevant). When testimony of a prior inconsistent statement is admitted for impeachment purposes, it is appropriate to instruct the jury of the limited use for that evidence. No such instruction was given in this case.

Moreover, under Michigan law, "[i]nconsistent out-of-court statements of a witness are admissible only for impeachment purposes and, since they would otherwise be hearsay, cannot be used as substantive evidence of the truth of the matter asserted." *People v. Kohler*, 113 Mich.App. 594, 599, 318 N.W.2d 481 (1981) (citing *People v. White*, 401 Mich. 482, 257 N.W.2d 912 (Mich.1977)). Thus, even if Jones's statement was admitted to impeach Terry's testimony, it would not be admitted for its truth or as substantive evidence of guilt. Rather the jury could use the statement only for the limited purpose of determining Terry's credibility and the reliability of his testimony to the contrary.[4]

Petitioner argues that this statement is the sole piece of evidence linking him to the crime. His argument is compelling. Other than the testimony of Officer Mata, which was contradicted by other testimony, and the testimony of Teika Thomas that suggested that Petitioner attempted

---

4. Of course, in this habeas corpus proceeding, this Court does not review the Michigan Court of Appeals' application of Michigan law. Nevertheless, the use of Jones's statement bears directly on the issue of prejudice under *Strickland*.

to persuade her not to testify against him, but did not directly implicate him in the crime,[5] there is little to link Petitioner to this crime. Moreover, during deliberations, the jury apparently specifically asked for Jones's testimony. Thus, we cannot conclude that the prosecution's use of this evidence was merely harmless error. *United States v. Alonzo,* 991 F.2d 1422, 1427 (8th Cir.1993) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." ').

Although Petitioner may be able to establish prejudice as a result of his counsel's failure to object to the admission of Jones's hearsay testimony, at the end of the day, we find this claim to be without merit because counsel's performance was not deficient under *Strickland.*

## C. Failure to Request an Accessory–After–the–Fact Instruction

■ Petitioner argues here, as he did before the district court and the Michigan Court of Appeals, that trial counsel was ineffective for failing to request an accessory-after-the-fact instruction. Specifically, Petitioner claims "that absent the accessory after the fact instruction, the jury was left with the choice of convicting him of the charged offenses under the aiding and abetting theory, or of acquitting, and that the jury was not aware than an accessory after the fact is not the same as an aider and abettor." *People v. Cathron,* 2000 WL 33522357, at *8.

The Michigan Court of Appeals concluded:

The trial court must instruct on lesser included offenses when requested and if supported by the evidence. *People v. Moore,* 189 Mich. Ct.App. 315, 319, 472 N.W.2d 1 (1991). An accessory after the fact is a person who, with knowledge of the other's guilt, gives assistance to a felon in the effort to hinder the felon's detection, arrest, trial or punishment. *People v. Perry,* 460 Mich. 55, 62, 594 N.W.2d 477 (1999). When reviewing the propriety of a requested lesser included offense instruction, we first determine if the lesser offense is necessarily included in the greater charge, or if it is a cognate lesser included offense. Necessarily included lesser offenses "must be such that it is impossible to commit the greater without first having committed the lesser." Cognate lesser included offenses "are related and hence 'cognate' in the sense that they share several elements, and are of the same class or category, but may contain some elements not found in the higher offense." [*People v. Bailey,* 451 Mich. 657, 667–68, 549 N.W.2d 325 (1996), citing *People v. Ora Jones,* 395 Mich. 379, 387, 236 N.W.2d 461 (1975).]

Accessory after the fact is not a lesser included offense of robbery, home invasion or receiving and concealing stolen property, because it need not be committed as part of the greater offenses. Nor is it a cognate lesser offense because it does not protect the same societal interests as the other offenses. *See Perry, supra* at 62, 594 N.W.2d 477 (noting that the crime of accessory after the

---

5. Teika Thomas's testimony that Petitioner attempted to persuade her not to testify is not probative of guilt, although it may bear on Petitioner's credibility. Petitioner knew Teika Thomas before the robbery occurred and she testified that she had not seen Petitioner at the scene of the crime. Given the facts of this case, Petitioner was as likely to attempt to persuade Teika Thomas not to testify against him whether he was guilty or not. Thus, this portion of Teika Thomas's testimony does not make it any more likely that Petitioner committed the crime in question.

fact is akin to obstruction of justice, and that laws forbidding obstruction of justice clearly serve a different purpose than those that forbid the taking of a life). In *Perry, supra* at 63 n. 19, 594 N.W.2d 477, the Court further noted that the prosecution had not charged the defendant as an accessory after the fact, and that the defendant's request for an instruction on accessory after the fact "was in the nature of a motion to amend the information," the denial of which was not an abuse of discretion.

Further, in the instant case, if the jury had doubt as to defendant's participation in the robbery or home invasion, it could have convicted him only of the receiving and concealing charge. In addition, defendant did not overcome the presumption that counsel's failure to request the instruction was sound trial strategy. Defendant's theory of the case was that he had absolutely nothing to do with the crimes and was merely in the wrong place at the wrong time. An instruction which automatically implied that defendant was involved in the crimes would have undermined this theory.

*Id.* at *9.

Thus, under Michigan law, accessory after the fact is not a lesser included offense of the crimes of armed robbery, home invasion or receiving stolen property over $100. Moreover, because an accessory after the fact is "a person who, with knowledge of the other's guilt, gives assistance to a felon in the effort to hinder the felon's detection, arrest, trial or punishment," the evidence in this case did not support an accessory-after-the-fact instruction in Petitioner's case. The evidence put forth by the prosecution supported the finding that Petitioner participated in the planning of the robbery and drove the getaway car during the robbery. In contrast, if the jury believed the evidence put forth by Petitioner, it would conclude that Petitioner was not involved in the crime at all. There was no evidence that Petitioner secreted Terry or the other robber or, after the fact, assisted in their escaping detection or arrest.

The Michigan Court of Appeals' conclusion that the decision not to request this instruction was reasonable trial strategy is not contrary to or an unreasonable application of *Strickland* because the offense of accessory after the fact is not a lesser-included offense of the charged crimes, the evidence did not support such an instruction, and, if given, such an instruction would have undermined Petitioner's alibi defense.

### III. CONCLUSION

For the reasons described above, we **AFFIRM** the judgment of the district court.