RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0292P (6th Cir.)
File Name: 02a0292p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

OLEN E. HUTCHISON,
　　　　*Petitioner-Appellant,*

　　　*v.*

RICKY BELL, Warden,
　　　　*Respondent-Appellee.*

No. 01-5214

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 98-00664—James H. Jarvis, District Judge.

Argued: April 24, 2002

Decided and Filed: August 29, 2002

Before: SILER, MOORE, and COLE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Dana C. Hansen, FEDERAL DEFENDER
SERVICES, Knoxville, Tennessee, for Appellant. Alice B.
Lustre, OFFICE OF THE ATTORNEY GENERAL,
CRIMINAL JUSTICE DIVISION, Nashville, Tennessee, for
Appellee. **ON BRIEF:** Dana C. Hansen, FEDERAL
DEFENDER SERVICES, Knoxville, Tennessee, for
Appellant. Alice B. Lustre, Michael E. Moore, Paul G.
Summers, OFFICE OF THE ATTORNEY GENERAL,

1

CRIMINAL JUSTICE DIVISION, Nashville, Tennessee, for Appellee.

————————

**OPINION**

————————

R. GUY COLE, JR., Circuit Judge.  Olen E. Hutchison, a Tennessee prisoner under sentence of death, sought habeas corpus relief in federal district court.  Following briefing and oral argument, the district court denied Hutchison's petition and entered summary judgment for the warden, Ricky Bell. On appeal, Hutchison alleges the following errors entitle him to relief: 1) the state trial court failed to grant him a severance from his codefendant in violation of his right to confront his accuser and his right to a fair trial; 2) the prosecution withheld exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); 3) he received ineffective assistance of counsel due to trial counsel's failure to investigate adequately his innocence; 4) prosecutorial misconduct denied him due process of law; and 5) the federal district court dismissed his petition without holding an evidentiary hearing.

Because we find no reversible error in the district court's decision, we **AFFIRM** its judgment.

**I.  BACKGROUND**

Hutchison was convicted in Tennessee state court for murder, solicitation to commit murder, and conspiracy to commit murder.   The victim of the crime was Hugh Huddleston and the prosecution's theory of the case was that Hutchison, an alleged drug dealer, conspired with his codefendant Chip Gaylor, and several other men, to kill Huddleston so that they could share in nearly $800,000 in insurance proceeds and other benefits. *State v. Hutchison*, 898 S.W.2d 161, 164-65 (Tenn. 1994), *cert. denied, Hutchison v. Tennessee*, 516 U.S. 846 (1995).

According to the evidence at trial, Huddleston, a bachelor in his mid-forties, had a "father-son relationship" with Gaylor. *Id*. Huddleston was exceedingly generous with Gaylor; he frequently gave Gaylor money and allowed Gaylor to live with him and to use his car. In addition, Gaylor was the sole beneficiary of Huddleston's life insurance policy, as well as Huddleston's will and other employment benefits. *Id.* at 165. The total value of Huddleston's estate was over $289,000. *Id.* Gaylor took advantage of the older man's generosity and need for companionship, until Huddleston was "virtually drowning in debt." J.A. at 822-23.

Following Huddleston's death, Tennessee authorities arrested Hutchison and Gaylor along with Richard Miller, Wilbur Hatmaker, Phillip Varnadore, M.C. Curnutt, and Johnny Rollyson on suspicion of murder. Hutchison and Gaylor were tried together. "The chief prosecution witness was Richard Miller, one of the conspirators and an acquaintance of [Hutchison] and of Gaylor and Huddleston." *Id.* Miller's testimony was used to weave together the state's theory of a conspiracy to kill Huddleston. Miller recounted a conversation between himself, Gaylor, and Hutchison, in which Hutchison was "talking about how much money he could make if he took insurance out on somebody and then had them killed." J.A. at 805-06. Miller said that Gaylor then remarked that he would pay $100,000 to kill somebody, but that his "insurance policy isn't good until I'm 30 years old." J.A. at 806. Hutchison responded, according to Miller, that that was "too long to wait." J.A. at 806.

Miller testified that about one week later, Hutchison asked Gaylor to get Huddleston to sign some insurance papers and a promissory note representing a $25,000 loan from Hutchison to Huddleston. *Hutchison*, 898 S.W.2d at 165. Miller testified that Huddleston would do anything that Gaylor asked. At Gaylor's urging, Huddleston signed a $250,000 life insurance policy, later changed to include an additional $250,000 accidental death benefit, which named Hutchison as the sole beneficiary. *Id.* The insurance policy was supposed to provide security for the $25,000 loan.

Miller, Gaylor, and Curnutt witnessed Huddleston sign the promissory note. *Id.* According to the prosecution, the debt was entirely fictitious. *Id.*

Hutchison then offered money to both Gaylor and Miller to kill Huddleston. Gaylor refused because his financial interest in Huddleston's other benefits would make him an obvious suspect. Miller also refused. Hutchison then asked Varnadore, one of his alleged drug-ring partners, to arrange the murder. Varnadore said he would "get his boys to do it." *Id.* at 165 & n.1. Varnadore and Hutchison agreed to drown Huddleston during a fishing trip because Huddleston could not swim. *Id.* at 165.

Gaylor arranged a fishing trip with Huddleston on Norris Lake, but only Miller showed up to accompany Huddleston on the day of the trip. *Id.* Huddleston and Miller rented a pontoon boat and took it onto the lake. Sometime after dark, two of the conspirators, Hatmaker and Rollyson, traveled to the pontoon boat on a separate boat and joined Huddleston and Miller, acting as though they were friends of Miller. *Id.* According to the plan, "Miller left to get bait in another boat he had brought on the trip." *Id.* Rollyson testified that after Miller left, Hatmaker pushed Huddleston into the water. *Id.* When Miller returned to the boat, all of the men were gone. Miller reported Huddleston's disappearance, and the body was found in the lake later that day. *Id.* "There were no obvious signs of violence on the body, but the pathologist later noted a deep bruise in the victim's scalp . . . possibly from striking his head on the boat, or being struck by a boat paddle or a fist." *Id.* at 166-65. Following Huddleston's death, both Gaylor and Hutchison filed claims to recover benefits under Huddleston's life insurance policies. *Id.* at 165.

In addition to the testimony of Miller and Rollyson, the prosecution introduced several letters written by Hutchison to Miller and Varnadore "communicating with them about the case and tacitly urging them to keep quiet." *Id.* Hutchison's cellmate testified that Hutchison told him that his

In sum, Hutchison has not demonstrated that the state court's resolution of his prosecutorial misconduct claims was an unreasonable application of federal law. The prosecutor's comments were permissible. Moreover, this Court has recognized the effectiveness of curative instructions in mitigating prejudice under similar circumstances. Therefore, Hutchison is not entitled to habeas relief on this claim.

### III. CONCLUSION

For the reasons stated above, this Court **AFFIRMS** the district court judgment.

We agree. Hutchison cannot show that the state court's resolution of the prosecutorial misconduct claim was objectively unreasonable. Hutchison does not challenge the state court's decision admitting drug activity evidence for non-propensity purposes; instead, he contends that the prosecution's closing argument asked the jury to use the evidence for improper purposes. Hutchison identifies, in particular, the prosecution's suggestion that an exhibit showing some calculations by the defendant was a "death book" that recorded Hutchison's intentions of using the insurance proceeds as a drug investment. J.A. at 829. However, these statements are directed at motive, not propensity, and therefore would not have misled the jury.

Moreover, Hutchison argues that the prosecution impermissibly called on the jury to act as a righteous army to combat drug activity. Hutchison cites the prosecution's statements analogizing the battle against the "tremendous forces of evil" marshaled by Hutchison and Gaylor to a battle in *Henry V*, J.A. at 840-41, as well as other references to the "evil ways" or "evil force" of Hutchison, J.A. at 836, 850. These comments, however, do not rise to the level of a constitutional violation. Although this Court has held that it is a constitutional violation to call upon the jury to solve a social problem, such as the drug trade, by convicting the defendant, it is not improper for the prosecutor to make a "mere allusion to the general need to convict guilty people." *Solivan*, 937 F.2d at 1154; *see also Buell v. Mitchell*, 274 F.3d 337, 365 (6th Cir. 2001). The prosecution did not call on the jury to "send a message" to anyone; it merely asked that the jury make Hutchison answer for his own particular guilty activities. J.A. at 841 ("I urge you to look alone to truth and justice in this case and . . . put an end to this evil partnership."). There was no allusion to the broader social problem of the drug trade or to the potential social consequences of an acquittal or refusal to impose the death penalty. Consequently, the remarks cited by Hutchison do not rise to the level of prosecutorial misconduct.

coconspirators "knew better than to say anything" and that "[i]f they did, they would end up the same way as the other guy." *Id.* The cellmate also stated that Hutchison said that "as long as everybody kept their mouth shut, then they would be found not-guilty, they couldn't prove nothing." *Id.*

Gaylor and Hutchison both testified at trial. During its cross-examination of Gaylor, the prosecution introduced a civil complaint Gaylor had filed in federal court. In the complaint, Gaylor argued that he should recover the proceeds of the $500,000 insurance policy naming Hutchison as beneficiary, because Hutchison was feloniously responsible for Huddleston's death. Gaylor maintained that he filed the claim solely upon his attorney's advice and that he did not know how Huddleston had died.

Hutchison testified that the loan and the insurance policy were part of a legitimate transaction, and denied any involvement in Huddleston's death. Hutchison testified that he did not know the value of the insurance policy other than that it was enough to secure the debt. Hutchison further stated that upon Huddleston's death, he had intended to seek recovery of only the $50,000 value of the note including interest, but that upon the advice of his attorney, he filed a claim for the entire $500,000 value.

The jury found Hutchison guilty of first-degree murder, conspiracy to commit murder, and solicitation to commit murder. *Id.* At sentencing, the state presented no additional evidence, but sought the death penalty on the grounds that Hutchison had "employed another to commit the murder for remuneration or the promise of remuneration," an aggravating factor set forth in Tennessee Code Annotated (T.C.A.) § 39-13-204(i)(4). The Tennessee Supreme Court summarized the evidence offered by Hutchison at sentencing as follows:

> The defendant presented the testimony of acquaintances to establish his good reputation in the community since childhood. His school records were introduced into evidence, along with proof of his success in the Future Farmers of America as a teenager. The defendant

testified about his skills in repairing small machines and described how he could be useful while in prison. His ailing father and his wife also testified about his good qualities as a son and spouse and pleaded for mercy. The jailer testified that Hutchison had been a good prisoner. The jury also heard testimony that the defendant had no prior criminal record and had been gainfully employed since adulthood.

*Hutchison*, 898 S.W.2d at 173. At the conclusion of the sentencing proceedings, Hutchison was sentenced to death.

The Tennessee Supreme Court affirmed Hutchison's conviction and sentence. *Id.* at 161. On May 4, 1995, three days after the denial of rehearing by the Tennessee Supreme Court, Hutchison filed a pro se petition for state postconviction relief alleging numerous errors, including insufficiency of the evidence, prejudice resulting from the trial court's refusal to sever his trial from Gaylor's, trial court errors in the admission of evidence, and ineffective assistance of counsel. The trial court rejected Hutchison's claims following an evidentiary hearing. The Tennessee Court of Criminal Appeals affirmed. *Hutchison v. State*, No. 03C01-9601-CC-00033, 1997 WL 607502, at *1 (Tenn. Crim. App. Oct. 3, 1997), *cert. denied*, 525 U.S. 904 (1998).

On August 1, 1996, Hutchison filed a second petition for state postconviction relief alleging that the prosecution had suppressed exculpatory and impeachment evidence. The trial court dismissed Hutchison's second petition on the grounds that: (1) the petition was untimely filed, (2) the claims had been waived, (3) the defendant was entitled to only one petition for postconviction relief, and (4) the defendant had failed to state a claim upon which relief could be granted. The Tennessee Court of Criminal Appeals affirmed the dismissal on the grounds that Hutchison's petition was procedurally barred by the statute of limitations and waiver rules. *Hutchison v. State*, No. 03C01-9702-CR-00065, 1997 WL 776342, at *1 (Tenn. Crim. App. Dec. 18, 1997).

Hutchison's claim relating to the prosecution's impermissible references to religion was procedurally defaulted. This claim was not raised before either the state supreme court on direct review or the criminal appeals court on postconviction review. Dist. Ct. Op. at 63. Hutchison has not alleged any facts tending to show cause for his failure to raise this claim below.

Hutchison's second misconduct claim relates to the prosecutor's references to Hutchison's involvement in drug activity during closing argument. Hutchison argues that the prosecution improperly cited evidence of Hutchison's drug activity to show criminal propensity and to argue that Hutchison should be convicted to further the public policy against drugs. *See United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991) (finding error where a prosecutor called on jurors to convict defendant in order to deter drug activity and mitigate the social problems stemming from the drug trade).

The state criminal appeals court, upon postconviction review, rejected this claim. *Hutchison*, 1997 WL 607502, at *16. The court noted that "testimony concerning illegal drug activity [was] admissible because the conspiracy to commit murder was linked to the prior relationship among the co-conspirators based upon their involvement in the drug business." The court noted that although the prosecutor's remarks had a potential to misfocus the jurors, "the major thrust of the state's comments focused consideration on the petitioner's financial motives for the murder," which was relevant to the aggravating factor regarding murder for remuneration. *Id.* at *12.

The district court agreed with the criminal appeals court's conclusion that the prosecutor's comments focused upon those issues for which the drug evidence was properly admitted. Dist. Ct. Op. at 66. The court also noted that the prosecutor's comments were "fairly isolated and objected to by petitioner's counsel" and that the prosecutor did not misstate the evidence. Dist. Ct. Op. at 66-67.

his coconspirators. J.A. at 811 (questioning Miller about prior act of abuse). Nevertheless, there is no indication that Hutchison pursued any possible omissions by his counsel relating to these matters during postconviction proceedings. *See M. Williams*, 529 U.S. at 439. Hutchison has made no showing that he satisfies the strict requirements of § 2254(e)(2)(A)&(B). Therefore, Hutchison is precluded from developing the factual basis of his ineffective assistance claims at this stage of the proceedings.

### E. Prosecutorial Misconduct

Hutchison's final argument is that he was denied due process by the prosecution's improper references to religion and Hutchison's alleged drug involvement during closing arguments in the guilt phase of the trial.[8] Specifically, Hutchison claims that the prosecutor's reference to the Ten Commandments, allusions to Gaylor as a "Judas goat," and references to Hutchison as an "evil force" and leader of a "drug empire" denied him due process.

"When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Habeas relief is warranted when the prosecutor's conduct was "so egregious so as to render the entire trial fundamentally unfair." *Id.* (quotation omitted). In this Circuit, whether a prosecutorial remark rises to the level of a due process violation depends on (1) whether the remark tended to mislead the jury or to prejudice the accused; (2) whether the remark was isolated or extensive; (3) whether the remark was accidentally or deliberately placed before the jury; and (4) the strength of the evidence against the accused. *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir 1994).

---

[8]Hutchison raises a number of additional misconduct arguments, but none is sufficient to establish a due process violation or warrant detailed discussion.

Having failed to gain relief in state court, Hutchison petitioned the district court for habeas corpus relief. Respondent moved for summary judgment. Following oral argument, the district court entered a final order granting summary judgment to the respondent on all of Hutchison's claims. This Court granted a certificate of appealability on the following issues:

Issue I: Whether the failure to grant a severance of the trial between Hutchison and his codefendant, Gaylor, denied Hutchison a fair trial. This issue also includes whether the district court in habeas corpus should have granted a hearing on this question.

Issue II: Whether the petitioner was denied the right to effective assistance of trial counsel, in both the guilt and sentencing phases of the trial.

Issue III: Whether Hutchison's constitutional rights were violated by the withholding of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). A part of this issue is whether the district court erred in its ruling below.

Issue IV: Whether prosecutorial misconduct at trial violated petitioner's constitutional rights.

Issue V: Whether the district court should have held a hearing in order for petitioner to develop the factual basis of his claims.

### II. DISCUSSION

### A. Standard of Review

We review a district court's legal conclusions in a habeas proceeding *de novo*. *Barker v. Yukins*, 199 F.3d 867, 870 (6th Cir. 1999).

Because Hutchison filed his habeas petition after April 4, 1996, the provisions of the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA") apply to this case. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under AEDPA, a federal court may not grant habeas relief for any claim adjudicated on the merits in state court, unless that state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

*T. Williams v. Taylor*, 529 U.S. 362 (2000), provides interpretive guidance for these two exceptions. A state court judgment will be "contrary to" federal law if the state court either "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.* at 405-06. A state court unreasonably applies federal law when it applies federal law to facts in a manner that is "objectively unreasonable." *Id.* at 409. An objectively unreasonable application "is different from an *incorrect* application of federal law. . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410-11.

Under AEDPA, a state court determination of historical facts is presumed correct, unless the petitioner rebuts this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). AEDPA also limits a federal court's ability to grant an evidentiary hearing:

> (e) . . . .
> (2) If the applicant has failed to develop the factual basis

investigation. Thus, Hutchison cannot point to any record evidence to show that defense counsel's failure to present this evidence was anything other than a strategic decision. A decision not to present evidence of Gaylor's independent motive would have been consistent with counsel's trial strategy, which was to argue that "no murder had been committed." *Id.*

Second, even if Hutchison's attorneys were deficient for failing to present this evidence, Hutchison has not shown prejudice. The standard of prejudice for an ineffective assistance of counsel claim parallels the materiality requirement for a *Brady* claim. *See Strickland*, 466 U.S. at 694. Because much of the undiscovered evidence is the same evidence cited in support of Hutchison's *Brady* claim, any error in failing to discover this evidence was not prejudicial for the same reasons that this evidence was not material for *Brady* purposes.

Finally, Hutchison has failed to make diligent efforts to develop the factual basis for his ineffective assistance claims in the state courts; he therefore cannot avoid the requirements of 28 U.S.C. § 2254(e)(2). *See M. Williams*, 529 U.S. at 437. Hutchison did receive an evidentiary hearing on his ineffective assistance of counsel claims in state court. If, as Hutchison contends, a reasonable investigation would have revealed the evidence discussed above, then it should have been developed in relation to his ineffective assistance claims during his first postconviction proceeding. Hutchison certainly was on notice of Davidson's potential testimony, as the two are longtime acquaintances, so this evidence could have been presented to the state court had Hutchison been diligent. The record also shows facts that should have put Hutchison on notice of potential evidence of Huddleston's financial problems, including the prosecutor's statement that Huddleston was "virtually drowning in debt." J.A. at 822. Moreover, the record suggests that Hutchison was aware of prior acts of physical abuse by Miller against Huddleston, which would have provided notice that evidence of an independent motive for the murder existed for one or more of

*Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997); *see also Martin v. Mitchell*, 280 F.3d 594, 608 (6th Cir. 2002) (holding that the petitioner failed to show ineffective assistance where he did not demonstrate "how the retention of experts, an examination of Henderson's statement, and contacting and/or interviewing his family members would have been beneficial to his defense").

On appeal, Hutchison contends that trial counsel's investigation was deficient in failing to uncover many of the same materials alleged to be suppressed by the prosecution in his *Brady* claim. These materials include (1) evidence that Huddleston had financial problems; (2) evidence that would rebut the prosecution's drug ring theory, particularly the statement by John Davidson that he knew Hutchison for seven years and was not aware of any drug activity; and (3) evidence relating to the possible homosexual relationship between Gaylor and Huddleston. Hutchison argues that a reasonable investigation by counsel would have uncovered this evidence -- a claim supported by the fact that much of this evidence was uncovered by an insurance investigator who spoke primarily with Huddleston's coworkers.

This evidence is insufficient to supply a basis for habeas relief. First, Hutchison has presented no evidence to show that his counsel was deficient in failing to present this evidence. There is nothing in the record indicating defense counsel's reasons for not presenting this evidence. In the absence of such evidence, we are to presume that "counsel's conduct falls within the wide range of reasonable professional assistance" guaranteed by the Constitution. *See Cone*, 122 S. Ct. at 1854. Hutchison asserts that the evidence was not discovered due to defense counsel's inadequate investigation. There is no record evidence to support this claim. Defense counsel was not asked about any of the aforementioned evidence during Hutchison's postconviction proceedings. Defense counsel hired an investigator and met with Hutchison on many occasions before trial to discuss witnesses. *Hutchison*, 1997 WL 607502, at *4. There is no record evidence concerning what was or was not uncovered by this

of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
(A) the claim relies on--
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254.

In *M. Williams v. Taylor*, the Supreme Court interpreted the opening clause of § 2254(e)(2) to contain its own "diligence" requirement, separate from that of § 2254(e)(2)(A)(ii). *See* 529 U.S. 420, 434-35 (2000). The "failed to develop" clause in § 2254(e)(2) means

not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts. The purpose of the fault component of "failed" is to ensure the prisoner undertakes his own diligent search for evidence. Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court . . . .

*Id.* at 435. "Diligence" for purposes of § 2254(e)(2) "will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

If the petitioner fails the diligence requirement of § 2254(e)(2), he is channeled into the strict requirements of subparts (A) and (B). Under those circumstances, a federal court may grant an evidentiary hearing only if the claim relies

on "a new rule of constitutional law" or facts "that could not have been previously discovered through the exercise of due diligence"; *and* "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(A)&(B).

### B.  Severance Issues

Hutchison argues that the state court's failure to sever his trial from his codefendant, Chip Gaylor, prejudiced him in two ways. First, it permitted Gaylor's civil complaint, which named Hutchison as Huddleston's killer, to be introduced as evidence against Hutchison in violation of the Confrontation Clause. Second, it deprived him of a fair trial because it prevented Hutchison from introducing evidence that would have inculpated Gaylor or exculpated himself. In addition to these substantive claims, Hutchison submits that the district court should have granted him an evidentiary hearing to support his claims.

### 1.  Introduction of the Civil Complaint

Hutchison argues that he was prejudiced when the prosecution introduced the civil complaint filed by Gaylor seeking to recover the proceeds of the $500,000 insurance policy to which Hutchison was named beneficiary. The complaint asserts that "Plaintiff HUTCHISON is barred from recovering any proceeds of the policy because he was feloniously responsible for the death of the insured." J.A. at 629.

On direct appeal, the Tennessee Supreme Court found that the complaint was properly introduced to impeach Gaylor, but was inadmissible hearsay as to Hutchison. *Hutchison*, 898 S.W.2d at 166. Nevertheless, the Tennessee Supreme Court found the introduction of the complaint to be harmless error because:

To prevail on a claim of ineffective assistance of counsel, the petitioner must show two elements: deficient performance and prejudice to the defendant. *See Bell v. Cone*, 122 S. Ct. 1843, 1850 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir.), *cert. denied*, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. The prejudice element requires the defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Hutchison presented his ineffective assistance claim in his first state postconviction petition. The trial court denied relief, and the criminal appeals court affirmed. *Hutchison*, 1997 WL 607502, at *13. The criminal appeals court noted that petitioner failed to present any witnesses who could have been called by trial counsel at his evidentiary hearing or provide any facts as to what testimony the witnesses would have offered at his trial. *Id.* In the absence such evidence, "the trial court had insufficient evidence to determine either if the failure to call a witness was deficient performance by trial counsel or if such failure constituted material prejudice to the petitioner's cause." *Id.*

Given the absence of proof at Hutchison's postconviction hearing, the state court's application of the *Strickland* test was not objectively unreasonable. This Court has held that a petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material.

The record indicates that Hutchison was on notice of the insurance investigator's report, as well as previous acts of physical abuse against Huddleston involving Davis and Miller. For example, during closing arguments, the prosecution referenced comments made by Hutchison to the insurance investigator. J.A. at 833. Having personally spoken with the insurance investigator, Hutchison should have been aware of the report. In addition, the record shows that the defense was aware of facts concerning acts of physical abuse by Miller towards Huddleston. On cross-examination of Miller, the defense asked about an incident in which Miller and David Davis twisted Huddleston's arm behind his back and forced him to the ground. J.A. at 811. This question reveals that the defense was aware that Davis, the purported source of Miller's statement that Miller and Gaylor had planned the murder, possessed relevant information. Hutchison's failure to investigate these claims and develop the factual basis for them in state court triggers the strict requirements of 28 U.S.C. § 2254(e)(2)(A)&(B), which Hutchison does not claim to have satisfied. Therefore, 28 U.S.C. § 2254(e)(2) precludes granting Hutchison an evidentiary hearing to develop the factual basis of his *Brady* claims.

### D.  Ineffective Assistance of Counsel

Hutchison also alleges that his trial counsel's performance fell below the standard guaranteed by the Sixth Amendment. Specifically, he argues that his counsel inadequately investigated exculpatory and mitigating evidence that could have been presented at the guilt phase of trial.[7]

---

[7] Hutchison's other claims of ineffective assistance of counsel have not been adequately briefed. Hence, we find them to be waived. *See United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . ." (citation and quotation marks omitted)).

The complaint, filed long after Hutchison's indictment, cast blame for the murder on a known suspect, a likely person for anyone seeking insurance proceeds to blame. Thus, the complaint had little probative value regarding Hutchison's guilt. In addition, the substantive evidence at trial supported a finding of Hutchison's guilt beyond a reasonable doubt.

*Id.* at 167.

Hutchison argues that the denial of the severance and admission of the complaint violated his Sixth Amendment right to confront his accuser. He bases his constitutional claim on *Bruton v. United States*, 391 U.S. 123 (1968). In *Bruton*, the Supreme Court held that the admission of a nontestifying codefendant's confession which clearly implicated another defendant at a joint trial was a violation of the other defendant's rights under the Confrontation Clause. *Id.* at 137. The Court noted that the nontestifying codefendant's confession "added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since [the codefendant] did not take the stand." *Id.* at 128. The Court reasoned that codefendant confessions that implicate another defendant are both "devastating to the defendant" and inherently untrustworthy "given the recognized motivation to shift blame onto others." *Id.* at 136.

However, the scope of the *Bruton* decision was limited in *Nelson v. O'Neil*, 402 U.S. 622 (1971). In *O'Neil*, the prosecution elicited testimony about a codefendant's confession, which implicated another defendant. The codefendant testified at the joint trial and denied making the confession. *Id.* at 624. The Court held that the defendant's rights were not violated by the admission of his codefendant's confession under those circumstances. The *O'Neil* Court explained that the holding of *Bruton* was limited to situations in which the codefendant does not testify at trial, thereby depriving the defendant the opportunity to cross-examine the declarant of the confession. *Id.* at 627. The Court reasoned

that there would be no Confrontation Clause problem "where a codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts." *Id.* at 629-30. This is because the denial of the inculpatory confession generally is more favorable to the defendant than anything the defendant could elicit on cross-examination. *Id.* at 629.

In light of *O'Neil*, we conclude that the state court's decision that the admission of the civil complaint was harmless error is not contrary to or an objectively unreasonable application of federal law. *See T. Williams*, 529 U.S. at 405-06, 409. We assume, *arguendo*, that Gaylor's civil complaint is the functional equivalent of an inculpatory confession. *See Vincent v. Parke*, 942 F.2d 989, 991 (6th Cir. 1991) (suggesting in dicta that an extra-judicial statement that is not a confession, but clearly implicates the defendant, may raise Sixth Amendment concerns). *O'Neil* instructs us that there is no constitutional violation if the codefendant testifies on behalf of the defendant. In this case, Gaylor testified favorably to Hutchison regarding the underlying facts. Gaylor stated that it was his lawyer's suggestion to attempt to recover under the insurance policy once Hutchison was indicted. Gaylor stated that he did not hold the belief that Hutchison killed Huddleston, and that he did not know how Huddleston had died. While Gaylor did not unequivocally disavow the contents of the civil complaint, but instead attributed the contents to his lawyer, we cannot conclude that this minor difference renders the state's refusal to find prejudice contrary to or an unreasonable application of federal law. *See T. Williams*, 529 U.S. at 406-07, 409. Hence, we find no reversible error.

## 2. Prejudicial Joinder

Hutchison's primary claim is that the joint trial forced him to present a unified defense with Gaylor. As a corollary, Hutchison alleges that he was prevented from introducing

materials, he cannot demonstrate prejudice sufficient to excuse the default.

## 3. Evidentiary Hearing

Hutchison has not demonstrated the requisite diligence to support his request for an evidentiary hearing. Under § 2254(e)(2), a petitioner who has failed to develop the factual record in the state courts due to his own lack of diligence will not be given an evidentiary hearing unless he can meet the stringent requirements set forth in that section. *See M. Williams*, 529 U.S. at 432. Where, as here, the failure to develop the factual basis of a constitutional claim is attributable to procedural default, the determination of whether the petitioner has been diligent in developing his claim parallels the issue of whether he can show cause for his default. *Id.* at 444.

As explained above, Hutchison has not shown cause for failing to assert his *Brady* claims in his first petition. Neither has he shown any facts indicating that he was diligent in seeking an evidentiary hearing prior to the expiration of the statute of limitations, which occurred over seven months after he allegedly discovered the first group of *Brady* claims. In addition, Hutchison has not identified any external cause for his failure to request disclosure of the TBI files until after the filing of his federal habeas petition.

Moreover, the record shows that the petitioner was on notice of possible *Brady* material in sufficient time to raise the claims in state court. The petitioner's failure to promptly investigate those claims and develop the factual record precludes granting an evidentiary hearing unless the requirements of 28 U.S.C. § 2254(e)(2)(A) & (B) are satisfied. *See id.* at 439 (holding that a petitioner was not diligent in developing record of allegedly suppressed mental health report where trial transcript revealed facts that should have put counsel on notice of report's existence, but counsel made no further efforts to discover).

The report of the polygraph examination of Rollyson would have had little value for the defense. Rollyson testified that he was on the boat when Huddleston drowned. The polygraph report suggested that he answered deceptively to questions about whether he touched Huddleston while he was in the water. Although the polygraph report contradicts Rollyson's testimony at trial that he did not touch Huddleston and did not see him fall into the water, it shows only inconsistency in Rollyson's statements about his own involvement in the crime. It does not exculpate Hutchison. Moreover, the defense was able to impeach Rollyson with a prior statement given to the police that he did touch Huddleston while Huddleston was in the water. The report, therefore, would have added little to the defense.

Finally, Hutchison points to the statement from John Davidson, who claims to have known Hutchison for seven years, indicating that Davidson was unaware of any drug activity on Hutchison's part. This evidence may have some exculpatory value insofar as it rebuts the prosecution's theory that the crime was motivated by Hutchison's desire to expand his drug business. However, "[t]he *Brady* rule does not assist a defendant who is aware of the essential facts that would allow him to take advantage of the exculpatory evidence at issue." *Coleman*, 268 F.3d at 438. Presumably, if Davidson and Hutchison knew each other as well as Davidson claims, Hutchison would have known about any potential testimony from Davidson. Therefore, Hutchison was aware of the essential facts necessary for him to take advantage of this testimony. Moreover, Davidson's statement is not particularly strong evidence; the mere fact that one of Hutchison's longtime friends was unaware of drug activity does not rule out the possibility that drug activity occurred without his knowledge.

Taken together, these items do not so undermine confidence in the jury's verdict that they could be considered "material" for *Brady* purposes. Therefore, even if Hutchison could show cause for his failure to raise his claims relating to the TBI

evidence that would have inculpated Gaylor or exculpated himself.

Hutchison's severance claim does not warrant habeas relief. Severance is governed by Tennessee state law. *See Hutchison*, 898 S.W.2d at 166. State-law trial errors will not warrant habeas relief unless the "error rises to the level of depriving the defendant of fundamental fairness in the trial process." *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993). Moreover, the Supreme Court has held that "mutually antagonistic defenses are not prejudicial *per se*." *Zafiro v. United States*, 506 U.S. 534, 538 (1993) (interpreting FED. R. CRIM. P. 14); *see also Stanford v. Parker*, 266 F.3d 442, 458 (6th Cir. 2001) (habeas relief is not warranted for failure to sever "merely because defendants present antagonistic defenses").

Hutchison argues that he may have been able to present a more effective defense had he been able to present evidence implicating Gaylor. But this is merely a version of the antagonistic defense argument. Hutchison was free to pursue such a strategy. He apparently declined to do so for fear that Gaylor would try to shift the blame towards him. Such a speculative risk, however, is not sufficient to show that the Tennessee Supreme Court's decision upholding the joint trial was objectively unreasonable. *See Zafiro*, 506 U.S. at 538.

Hutchison also complains that the joint trial prevented him from presenting exculpatory evidence. Specifically, he alleges that the joint trial prevented him from presenting testimony to rebut the state's claim that he was seeking to recover $500,000 under Huddleston's life insurance policy. Hutchison contends that the trial court unfairly excluded his civil attorney's testimony supporting Hutchison's claim that he sought to recover only $50,000, the value of the note between Huddleston and Hutchison. Hutchison also maintains that the trial court prejudiced his case by excluding a federal court's judgment in his civil suit to recover the proceeds of the $500,000 life insurance policy. The state trial

court excluded both the attorney's testimony and the federal court judgment as hearsay.

The Supreme Court has suggested that failure to sever can rise to the level of a constitutional violation when "essential exculpatory evidence that would be available to a defendant tried alone [is] unavailable in a joint trial." *Id.* at 539 (citing *Tifford v. Wainwright*, 588 F.2d 954 (5th Cir. 1979)). However, Hutchison has not established how the lawsuit evidence would have been essential to his defense. Hutchison was allowed to testify that he intended to recover only $50,000 under the insurance policy, and that it was his attorney's idea to file a suit for the full $500,000 policy value. Although his attorney's testimony would have corroborated his statements, Hutchison was not denied the opportunity to explain his motives. Also, the excluded federal court judgment, even if admissible, had virtually no relevance to Hutchison's claim that he only sought to recover the amount of the note. The civil judgment was a partial grant of summary judgment to the insurance company, which ruled that Hutchison was entitled to no more than the $50,000 value of the note. The civil judgment is not probative of Hutchison's intent; it merely ruled on the outer limits of any legal rights he possessed under the policy. As a result, we find no reversible error.

### 3. Evidentiary Hearing

Finally, Hutchison has failed to develop the factual basis for his claims. *See* 28 U.S.C. § 2254(e). Hutchison's counsel never indicated what evidence he would have presented had the trial judge ruled favorably on the severance motion. Nor did the defense indicate that it wished to present any such evidence when it requested a severance. In his brief, Hutchison claims that he was precluded from presenting evidence that Gaylor and Miller had tried to kill Huddleston, as well as evidence suggesting the existence of a homosexual relationship between Huddleston and Gaylor. Appellant's Br. at 26, 31. However, the only evidence in the record to establish these facts are the materials that Hutchison alleges

it is possible that Hutchison would not have received the files in time to file a claim prior to the expiration of the limitations period. Nonetheless, had he attempted to present the TBI materials to the state court, any difficulty he experienced in obtaining the TBI files could have formed the basis of an argument for *Burford* tolling, which would have afforded the state court an opportunity to consider the claims. The fact that the TBI materials appear to have gone unrequested until after Hutchison had defaulted his state remedies means that he cannot establish cause for his default of these claims.

Even if Hutchison could establish cause, the items in the second group of *Brady* claims are not material for *Brady* purposes, and therefore are not sufficient to demonstrate prejudice resulting from Hutchison's default. Several of these materials, including the McCart statement, and the Huddleston letter, could be used to show that there was a sexual relationship between Huddleston and Gaylor, which might supply additional evidence of motive for Gaylor. However, it is not clear how this evidence would exculpate Hutchison. The prosecution's theory already posited that Gaylor was involved in the murder, so evidence inculpating Gaylor would not tend to show Hutchison's innocence. In addition, there was already abundant evidence indicating that Gaylor had a financial motive to murder Huddleston, insofar as Gaylor was the sole beneficiary under the will and another insurance policy. Therefore, it is unclear why evidence of another motive would have changed the jury's impression of Hutchison's guilt or made Hutchison more likely to pursue a theory of defense asserting that Gaylor acted to kill Huddleston without Hutchison's involvement.

Hutchison argues that McCart's statement has exculpatory value because she states that Gaylor talked about killing Huddleston with a group of people that did not include Hutchison. At best, however, this establishes that some discussion of killing Huddleston occurred when Hutchison was not present, but it does not exclude Hutchison from the conspiracy.

probability of a different result if the materials in this second group had been timely disclosed.

We agree with the district court. The burden of production is on Hutchison to demonstrate a material fact as to the cause of his default. Hutchison has produced no admissible evidence to show that the materials available to him during his habeas petition were not available before his first postconviction proceeding. Moreover, the insurance report materials listed in Hutchison's second group of *Brady* claims have little or no impeachment or exculpatory value. The fact that Curnutt delivered premium payments to the insurance company is not exculpatory, or otherwise inconsistent with the prosecution's case, since Curnutt was alleged to be a member of the conspiracy himself and was convicted for his involvement in a separate trial. J.A. at 820 (discussing Curnutt's involvement in the conspiracy); *see also Strickler*, 527 U.S. at 293. The fact that Huddleston talked with the nurse and rescheduled his physical examination does not refute Hutchison's involvement in arranging the insurance policy. The statement by Harmon indicating that Miller was nervous at Huddleston's funeral would add little to the defense, since Miller acknowledged at trial that he was at least complicit in the murder. Finally, the petitioner has not given any reason why the fact that the manager of the marina remembered Huddleston renting the boat would be exculpatory or impeach another witness.

The remaining materials in the second group appear to be documents from the TBI files. Petitioner cannot establish cause for his failure to present his claims relating to these materials in the state court. Hutchison's discovery motion to the district court reveals that he did not request the TBI records until December 14, 1998. J.A. at 65. This was long after the expiration of the Tennessee statute of limitations. Hutchison admits, however, that these materials could have been requested at the time that postconviction counsel was appointed prior to his first postconviction hearing in 1995. Appellant's Br. at 80. Given the difficulty Hutchison experienced in obtaining the TBI file once it was requested,

his attorneys failed to discover or were suppressed by the prosecution.[1] Without a record of the evidence that Hutchison would have presented at a separate trial, it is impossible to conclude that the state court unreasonably determined that he was not prejudiced. *See United States v. Cobleigh*, 75 F.3d 242, 248 (6th Cir. 1996) (holding that defendants must show what exculpatory evidence they would present at a severed trial to support claim). If Hutchison did possess evidence that would have allowed him to present a defense implicating Gaylor as the real killer, then his failure to develop the record as to these facts in state court will prevent him from obtaining an evidentiary hearing unless he can satisfy the stringent requirements of 28 U.S.C. § 2254(e)(2)(A)&(B). *See M. Williams*, 529 U.S. at 437. Hutchison has not attempted to make such a showing.

Because Hutchison has not demonstrated that the state trial court's application of the law was objectively unreasonable, and because he has failed to develop the factual basis for his claims, we find no error in the district court's opinion.

### C. *Brady* Claim

Hutchison also claims that the prosecution withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "There are three components of a

---

[1] Hutchison is in something of a double bind. If the defense team did possess facts at the time of trial showing that Miller and Gaylor attempted to kill Huddleston by themselves, then his *Brady* claim alleging that these facts were withheld from the defense would necessarily fail. *Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001) ("The *Brady* rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue."). If the defendant did not possess these facts, then the trial court's refusal to sever could not have altered significantly Hutchison's trial strategy.

true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Ultimately, we find Hutchison's *Brady* claim unavailing because it has been procedurally defaulted and because he cannot demonstrate cause or prejudice for the default.

### 1. Background

#### a. First Group of *Brady* Materials

Hutchison's claims are based upon two groups of materials. First, Hutchison claims that *Brady* materials were contained in the partially disclosed prosecutor's file, which he allegedly received on September 27, 1995, the day of his first postconviction hearing. These materials all appear to be part of the same insurance claim investigation report prepared by Huddleston's insurance company. The particular items cited by Hutchison include:

- A summary of a statement by Tony Goings, a co-worker of Huddleston's, who recounted a conversation with David Davis. According to the summary, Davis stated that Miller told him sometime in August 1988 that he (Miller) and Gaylor had "set up the whole thing involving Hugh's death," including the murder by drowning. J.A. at 581.

- A summary of a statement by Tom Bryan, who told the insurance investigator that he knew of one occasion in which Miller and Gaylor pulled a gun on Huddleston and beat him up. Bryan stated that he observed bullet holes in Huddleston's car. J.A. at 576.

witness weighs heavily in due process analysis); *Schledwitz*, 169 F.3d at 1016 (withholding evidence of purportedly "neutral" witness in investigation of defendant was "all the more egregious because Horne, as found by the district court, was the 'key' witness"). However, at trial, defense counsel did ask Miller about previous incidents of physical abuse of Huddleston. J.A. at 811 ("And do you admit or deny that you and David Davis went outside and in fact bent [Huddleston's] arm behind his back and put him to the ground?"). Miller denied these incidents; but the fact that defense counsel pursued this line of questioning suggests that he was aware of facts regarding physical abuse of Huddleston and was able to bring at least one of these alleged incidents to the jury's attention for the purpose of impeaching Miller.

Finally, any impeachment value of the evidence is undermined by other evidence in the record, including: Rollyson's corroboration of Miller's testimony, the existence of the life insurance policy naming Hutchison, the testimony of Hutchison's cellmate, and the letters written by Hutchison himself while in prison. *Hutchison*, 898 S.W.2d at 166.

In sum, the evidence cited by Hutchison in his first group of *Brady* claims does not satisfy the materiality test. Therefore, Hutchison cannot show prejudice stemming from its suppression.

#### (2) Second Group of *Brady* Materials

The district court determined that Hutchison had likewise failed to show cause for his failure to raise claims relating to the second group of *Brady* materials--the materials that were allegedly disclosed only after the filing of Hutchison's federal habeas appeal--in state court or prejudice resulting from his default. The district court explained that "it is not clear to the Court how petitioner could determine that the material contained in [the second group of claims] was not included in the previous records disclosed to and reviewed by petitioner's post-conviction counsel." Dist. Ct. Op. at 57. The district court also noted that petitioner could not show a reasonable

*Brady* purposes pertains only to the question of a defendant's guilt or innocence, not to the issue of a defendant's ability or inability to prepare for trial."). In *Schledwitz*, however, the petitioner provided affidavits from counsel stating specifically what witnesses would have been called had the evidence been disclosed, thus giving the court a basis to evaluate how the disclosure would have affected the trial. 169 F.3d at 1016. As noted above, the insurance report could not be used to prove the truth of Miller's statement that he and Gaylor acted alone. The primary items of evidence cited by Hutchison as supporting this defense strategy are statements relating to the possibility of a homosexual relationship between Gaylor and Huddleston and evidence that Gaylor and Miller had abused Huddleston on previous occasions. Such evidence, however, does not exculpate Hutchison; it merely inculpates a coconspirator who has already been found guilty of participating in the murder. This evidence is not inconsistent with the state's evidence or theory of guilt. In fact, Miller testified that Gaylor suggested that he knew of the right victim for the life insurance scheme. J.A. at 806. Even if the evidence established that Miller had concocted the murder plan, Hutchison would still be death-penalty eligible for his participation as a conspirator in a murder-for-hire scheme. *See generally State v. Porterfield*, 746 S.W.2d 441 (Tenn. 1988); *see also Strickler*, 527 U.S. at 293 (finding no prejudice where "petitioner's guilt of capital murder did not depend on proof that he was the dominant partner").

The remaining items included in Hutchison's first group of *Brady* claims are two statements in the insurance claims investigation indicating that Miller and Gaylor physically abused Huddleston in the past. As noted above, this evidence is not significantly exculpatory as to Hutchison. The evidence may have some value in impeaching Miller, who testified that he had never seen any physical confrontations between Gaylor and Huddleston. J.A. at 804. Miller was the "chief prosecution witness," *Hutchison*, 898 S.W.2d at 165, so any impeaching evidence would have been valuable to Hutchison at trial. *See Kyles*, 514 U.S. at 445-46 (indicating that denial of opportunity to use impeaching evidence against "essential"

- A statement in the insurance report indicating that Donnie Thomas, who worked on the cleaning crew for Huddleston's employer, observed Gaylor and Miller twisting Huddleston's arm behind his back and wrestling him to the ground. Thomas also stated that Huddleston feared for his life. J.A. at 578.

According to Hutchison, these materials were discovered on October 3, 1995, several days after his first postconviction hearing. Appellant's Br. at 12. He subsequently prepared a second pro se postconviction petition in January of 1996 setting forth *Brady* claims relating to the above materials.[2] However, he waited until August 1, 1996, to file the petition. The trial court denied Hutchison's second postconviction petition without a hearing, concluding that the petition was procedurally barred and failed to state a claim upon which relief could be granted. The Tennessee Court of Criminal Appeals affirmed, finding the claim procedurally defaulted. *Hutchison*, 1997 WL 776342 at *2, *3.

**b. Second Group of *Brady* Materials**

Hutchison asserts that he received a second group of *Brady* materials after filing this federal habeas petition, at which point he claims to have received a complete copy of the prosecutor's file, as well as a copy of the Tennessee Bureau of Investigations ("TBI") file concerning his case. The additional materials include:

- A statement by Karen McCart, who lived with Gaylor at Huddleston's trailer, which is apparently from the TBI file. McCart's statement includes references to a possible homosexual relationship between Gaylor and Huddleston. McCart also recalled an evening at the trailer when Gaylor told a number of people in attendance that if he killed

---

[2] Hutchison claims to have sent the petition to postconviction counsel Van Riper in February 1996, but asserts that Van Riper requested that Hutchison file the petition pro se sometime in July of that year.

Huddleston, he would get everything under the will. McCart stated that she met Hutchison only one time. McCart also stated that Gaylor physically abused Huddleston. J.A. at 587-89.

- A statement from the nurse who performed the pre-insurance physical examination of Huddleston, which appears to be from the TBI files. The statement explains that Huddleston rescheduled the examination on a number of occasions. J.A. at 600-01.

- A statement contained in the insurance claims investigation report indicating that an insurance agent, M.C. Curnutt (an alleged accomplice in the murder conspiracy), paid the premiums on Huddleston's insurance policy and claimed that he received the money from Huddleston. J.A. at 603.

- A summary in the insurance claims investigation report of a statement by Vance Harmon. Harmon stated that he spoke with Miller on the day of the funeral and that Miller said that "Hugh did not deserve what he got or what had happened to him upon the lake." J.A. at 592.

- A TBI report of a polygraph examination of John Rollyson, who was on the boat when Huddleston drowned and who testified at Hutchison's trial. The report indicated that Rollyson untruthfully stated that he did not touch Huddleston when he was in the water and that he did not agree with anyone to help drown Huddleston. The report also indicates that Rollyson gave inconsistent explanations for his answers. J.A. at 606-07.

- A statement by the manager of the marina contained in the insurance claims investigation report indicating that Huddleston came in to the marina on the day of the drowning and rented a boat after

hearsay"). In addition, Hutchison has offered no basis for concluding that disclosure of this item would have led to the discovery of other admissible evidence that could have been used to prove the substance of the statement--i.e., that Gaylor and Miller planned the murder alone. *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (finding no *Brady* violation where suppressed evidence was inadmissible and petitioner could offer only speculation that disclosure would have led to admissible evidence).

Moreover, although Hutchison's counsel could have asked Miller about the statement described in the insurance report on cross-examination, the insurance report itself would not have been admissible as extrinsic evidence of Miller's prior inconsistent statement. The account of Miller's statement in the insurance report contains multiple levels of hearsay: the report itself is an out-of-court statement that summarizes an out-of-court statement by Tony Goings, which in turn recounts an out-of-court statement by David Davis reporting the out-of-court statement of Miller. Although the out-of-court statement of Miller is admissible for impeachment purposes, the Tennessee Rules of Evidence, like the Federal Rules, permit introduction of multiple hearsay evidence only if "each part of the combined statements conforms with an exception to the hearsay rule." TENN. R. EVID. 805. Because there is no exception covering the intermediate levels of hearsay in the insurance report, the report would not be admissible to impeach Miller. *See Paradis v. Arave*, 240 F.3d 1169, 1179 (9th Cir. 2001) ("[I]f Haws' notes record Elliott's hearsay reports of Dr. Brady's hearsay statements, then the notes themselves would not be admissible, even to impeach Dr. Brady.").

Finally, Hutchison's claim that nondisclosure of Miller's statement prejudiced his trial strategy is insufficient to establish materiality. This Circuit has implied that it may consider whether suppression of *Brady* materials affected trial strategy in determining prejudice. *See Schledwitz v. United States*, 169 F.3d 1003, 1016 (6th Cir. 1999). *But see Phillip*, 948 F.2d at 249 ("Significantly, the issue of materiality for

. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Moreover, materiality "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35. Materiality is to be evaluated in light of the cumulative effect of the undisclosed evidence. *Id.* at 436. "[I]nformation withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes." *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991), *cert. denied*, 504 U.S. 930 (1992).

The chief piece of exculpatory and impeaching evidence advanced by Hutchison is the statement by Davis reporting Miller's statement that he (Miller) and Gaylor had "set up the whole thing involving Hugh's death" and had devised the plan to use two boats. J.A. at 581. Hutchison contends that this evidence was exculpatory insofar as it established that Gaylor and Miller acted alone in planning Huddleston's murder. Hutchison argues that the statement could have been used to impeach Miller because it was inconsistent with his testimony implicating Hutchison. Hutchison also contends that disclosure of this statement would have altered his trial strategy and supported his motion for severance.

Miller's statement to Davis is hearsay and could not be used to prove the truth of what was said--i.e., that Miller and Gaylor acted alone. The fact that any use of the evidence would be limited to impeachment mitigates the potential exculpatory impact of the evidence. *See United States v. Perez*, 280 F.3d 318, 349 (3d Cir. 2002) (finding that exculpatory out-of-court statement by witness "would not have made a difference in the trial because, while it may come in to impeach . . . , it could not come in for substantive consideration by the jury because it was inadmissible

having called earlier to make sure the boat would be available. J.A. at 597.

- A letter from Huddleston to Gaylor allegedly received from the TBI. In the letter, Huddleston makes comments strongly suggesting that his relationship with Gaylor was an intimate one. J.A. at 612-19.

Hutchison contends that these materials were among five banker boxes of records provided by the state in response to his request for disclosure of records. Respondent concedes that five bankers boxes were provided subsequent to the filing of Hutchison's federal habeas petition, but contends that many of these documents were duplicates and that it could not determine whether they had been previously disclosed.

### c. Procedure

Both the state courts and the federal district court concluded that Hutchison's *Brady* claims were procedurally defaulted. The state postconviction court denied Hutchison's second petition, which contained the first group of *Brady* claims, without an evidentiary hearing. The postconviction court cited three reasons for its decision: (1) the petition was barred under T.C.A. § 40-30-202, which provides a one-year statute of limitations for petitions for postconviction relief and provides that a prisoner may "in no event" file more than one postconviction petition; (2) the claims asserted in the second petition were waived under T.C.A. § 40-30-206(g) because they were not included in Hutchison's first petition for postconviction relief; and (3) the material included in Hutchison's petition was not *Brady* material. *Hutchison*, 1997 WL 776342 at *2, *3. The Tennessee Court of Criminal Appeals affirmed the postconviction court's ruling that Hutchison procedurally defaulted his *Brady* claims. *Id.* at *3. The criminal appeals court rejected Hutchison's argument that he did not have an adequate opportunity to present his *Brady* claims due to the timing of the prosecution's disclosure, and concluded that Hutchison had adequate opportunity to present the claims at his first postconviction hearing. *Id.* The court

did note, however, that it was improper for the postconviction court to reach a determination of the merits of Hutchison's *Brady* claims without holding an evidentiary hearing. *Id.*

The district court found that all of Hutchison's *Brady* claims were procedurally defaulted. First, the court noted that Tennessee's waiver rules and one-year statute of limitations for postconviction petitions were firmly established and regularly followed. Dist. Ct. Op. at 53 (citing *Fletcher v. State*, 951 S.W.2d 378 (Tenn. 1997); *Caldwell v. State*, 917 S.W.2d 662 (Tenn. 1996); *House v. State*, 911 S.W.2d 705 (Tenn. 1995)). Second, the court found that Hutchison had failed to show by clear and convincing evidence that he did not have a reasonable opportunity to present the first group of *Brady* claims at his first postconviction hearing. The district court therefore concluded that Hutchison could not show cause for his failure to comply with the state procedural requirement that these claims be raised at his first petition. Dist. Ct. Op. at 53-54.

The items in Hutchison's second group of *Brady* claims were similarly defaulted. The district court concluded that these claims were procedurally defaulted because they had not been presented to any state court and state procedural rules precluded bringing these claims in state court in the future. *See* Dist. Ct. Op. at 55; *see also Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991). The court also concluded that Hutchison could not show cause and prejudice to excuse his default as to these claims, because he could not prove that the federal habeas materials were not among the materials provided to Hutchison prior to his first postconviction hearing. Dist. Ct. Op. at 57. The district court also found that Hutchison had not shown a reasonable probability that the result of his trial would have been different had the materials been disclosed, and therefore Hutchison could prove neither materiality nor prejudice to succeed on the merits of his *Brady* claim. Dist Ct. Op. at 57.

interpreted this statement to imply that Hutchison had received the district attorney's file by September 8, 1995, seventeen days before Hutchison's initial postconviction hearing. Dist. Ct. Op. at 54. In addition, during oral argument on Hutchison's second state postconviction petition, Hutchison's counsel stated that "the materials that make up the basis for the Petition were not materials that were furnished by the State in discovery in the original trial. These were materials that were obtained by myself in the process of preparing for the second, or the Petition for Post-Conviction Relief for hearing." J.A. at 879. Although syntactically confusing, this statement suggests that the materials were disclosed during the preparation of the first postconviction petition.

Even if Hutchison did not receive the district attorney's file in time to raise the *Brady* claims in his first postconviction petition, he cannot show cause to excuse his failure to file his second petition within the one-year statute of limitations. *Hutchison*, 1997 WL 776342, at *3. Under the Post-Conviction Procedure Act of 1995, Hutchison had until May 10, 1996, to bring a timely petition for postconviction relief. *See Carter*, 952 S.W.2d at 419. Under any account of the facts, Hutchison received the first group of alleged *Brady* materials no later than September 27, 1995. He filed his second state postconviction petition on August 1, 1996. Hutchison has provided no credible explanation for his failure to raise these claims before the statute of limitations expired on May 10, 1996. We therefore find Hutchison has not demonstrated sufficient material facts to show cause for his procedural default.

### (b) Prejudice/Materiality

Even if Hutchison could show cause for his default as to the first group of *Brady* claims, the allegedly suppressed evidence is not material for *Brady* purposes. Therefore, Hutchison cannot show prejudice resulting from any default.

The Supreme Court has explained that the "touchstone of materiality is a 'reasonable probability' of a different result

could not show that his failure to present these claims was due to suppression rather than his own neglect, the district court concluded that Hutchison could not show cause for the default.

We agree with the district court. Hutchison has not presented clear and convincing evidence that he did not possess the first group of *Brady* materials prior to his first hearing. There is no affidavit or testimony from Hutchison's postconviction counsel regarding the timing of the prosecution's disclosures. Nor is there any documentary evidence addressing this question. The only item in the record cited by Hutchison to support his claim is the state's reply to his traverse in opposition to summary judgment filed before the district court. In replying to Hutchison's contention that a factual dispute existed over whether the files were provided "prior to" or "at" the first postconviction hearing, the state responded that the dispute could be eliminated "by amending the phrase to read 'immediately prior to' the hearing. Respondent is not asserting that the records were provided days or weeks before the hearing." J.A. at 369-70.

The record also supports the district court's conclusion that the materials were not suppressed prior to the first postconviction hearing. Hutchison's brief to the state criminal appeals court said of the *Brady* materials presented in Hutchison's second postconviction petition that "[t]hese items were part of a large volume of documents that the appellant was *allowed to examine before the hearing* on the original post conviction petition; however, the appellant and his counsel were not given adequate time to examine and utilize the same in order to make the same part of the original hearing." J.A. at 137 (emphasis added). Moreover, in an appearance before the postconviction court prior to Hutchison's first postconviction hearing, counsel for Hutchison requested a continuance, explaining that "[t]here are records of various law enforcement agencies, including the District Attorney's office, that I have not had an opportunity to review." J.A. at 857. The district court

## 2. Analysis

This Circuit examines four factors to determine when procedural default of a state rule will prevent a federal court's review on habeas: (1) there must be a state procedural rule applicable to the petitioner's claim that he did not comply with; (2) the state courts must have actually enforced the state procedural rule against petitioner's claim; (3) the state procedural forfeiture must be an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim; and (4) if the above three factors are met, the court may still excuse the default if the petitioner can demonstrate that there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002).

Tennessee state law provides that petitioners must file a petition for postconviction relief within one year from the date of the final action of the state's highest court on direct appeal. T.C.A. § 40-30-202(a). Petitioners may file only one petition attacking a single judgment; any subsequent petition is to be summarily dismissed. T.C.A. 40-30-202.[3] Hutchison

---

[3]T.C.A. § 40-30-202 provides:

(a) Except as provided in subsections (b) and (c), a person in custody under a sentence of a court of this state must petition for post-conviction relief under this part within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of such petition shall be barred. The statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file such an action and is a condition upon its exercise. Except as specifically provided in subsections (b) and (c), the right to file a petition for post-conviction relief or a motion to reopen under this chapter shall be extinguished upon the

does not dispute that his second petition was untimely under the statute of limitations or that his second petition was technically barred under the one-petition rule.[4]  Instead, he

expiration of the limitations period.

(b) No court shall have jurisdiction to consider a petition filed after such time unless:

(1) The claim in the petition is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. Such petition must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial;

(2) The claim in the petition is based upon new scientific evidence establishing that such petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or

(3) The claim asserted in the petition seeks relief from a sentence that was enhanced because of a previous conviction and such conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid, in which case the petition must be filed within one (1) year of the finality of the ruling holding the previous conviction to be invalid.

(c) This part contemplates the filing of only one (1) petition for post-conviction relief. In no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment. If a prior petition has been filed which was resolved on the merits by a court of competent jurisdiction, any second or subsequent petition shall be summarily dismissed. A petitioner may move to reopen a post-conviction proceeding that has been concluded, under the limited circumstances set out in § 40-30-217.

[4]The one-year statute of limitations and the one-petition rule were enacted as part of the Post-Conviction Procedure Act of 1995. By its terms, the Act applies to all postconviction petitions filed after May 10, 1995, the date the Act was passed. The Act also provides that persons who have grounds for postconviction relief existing prior to the passage of the Act will be granted one year from the date of passage to file postconviction petitions. *See Carter v. State*, 952 S.W.2d 417, 419, 420

## b.  Cause and Prejudice

Hutchison's default may nonetheless be excused if he can show cause for his failure to timely raise his *Brady* claims and prejudice resulting from his default. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  In the context of this *Brady* claim, the requirements for showing cause and prejudice parallel the elements of the underlying *Brady* violation. *Strickler*, 527 U.S. at 282.   Suppression of exculpatory or favorable impeaching evidence by the state that results in an inability to raise claims relating to that evidence in state court establishes cause for the ensuing default. *Id.*  The petitioner need not show that the prosecutor acted in bad faith or that defense counsel made a specific request for evidence. *United States v. Bagley*, 473 U.S. 667, 682 (1985).  However, unless the alleged *Brady* evidence is "material" for the purposes of the *Brady* rule, its "suppression d[oes] not give rise to sufficient prejudice to overcome the procedural default." *Strickler*, 527 U.S. at 282.

### (1) First Group of *Brady* Materials

#### (a) Cause/Suppression

The Tennessee appeals court found that Hutchison had received the alleged *Brady* materials prior to his first postconviction hearing. *See Hutchison*, 1997 WL 776342, at *3.  As it explained:

> Petitioner candidly admits that he had access to the alleged "*Brady*" material prior to the hearing on the first petition for postconviction relief.  There is no evidence in the record to suggest that Petitioner was not provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner as required by *Burford*, 845 S.W.2d at 208.

*Id.*  Giving deference to this factual finding, as required by AEDPA, the district court concluded that Hutchison had access to the *Brady* material prior to his first postconviction hearing.  *See* 28 U.S.C. § 2254(e)(1).  Because Hutchison

208. Thus, as with the Virginia rule, *Burford* provides an exception to the statute of limitations when the denial of the hearing itself would violate the petitioner's constitutional due process rights. Unlike *Ake*, the decision to apply the *Burford* exception does not depend upon the state court's determination of the merits of the petitioner's constitutional challenges to his conviction or sentence.[6] Indeed, the Tennessee Court of Criminal Appeals expressly stated that it was not reviewing the merits of Hutchison's *Brady* claim. *Hutchison*, 1997 WL 776342, at *3 ("[W]e determine[] that the petition was properly dismissed because it had been filed after expiration of the statute of limitations and a prior post-conviction petition had been filed and heard on the merits . . . ."). Because Hutchison, like the petitioner in *Coleman*, does not assert that the state's denial of a second postconviction hearing was itself a constitutional violation, the state court's decision not to apply the *Burford* exception is not reviewable by this Court. *Accord Scott v. Mitchell*, 209 F.3d 854, 868 (6th Cir. 2000) ("The Supreme Court . . . does not find the mere reservation of discretion to review for plain error in exceptional circumstances sufficient to constitute an application of federal law.").

---

[6] Hutchison also alleges that Tennessee state courts' application of *Burford* tolling is not an independent state law ground because the length of tolling will vary with the importance of the constitutional right alleged. *See State v. Caldwell*, 917 S.W.2d 662, 667 (Tenn. 1996). This argument is unavailing. As the United States Supreme Court has recently held, the mere categorization of a constitutional right by a state court for purposes of determining whether a procedural default may be excused does not render the state court's decision dependant on federal law. *See Stewart v. Smith*, 122 S. Ct. 2578, 2581 (2002) (analyzing an Arizona procedural bar that applies different standards for waiver based on whether the claim is of "sufficient constitutional magnitude"). Similarly, Tennessee courts need only examine the type of constitutional claim alleged to determine a reasonable tolling time under *Burford*; they need not address the merits of the claim itself.

alleges that the one year statute of limitations and the one petition rule do not constitute "adequate and independent" state grounds to uphold the conviction. Specifically, he charges that the Tennessee courts make a case-by-case due process exception to these provisions for those prisoners who present a legal or factual predicate that arises after the expiration of the limitations period.

### a. Firmly Established/Regularly Enforced

This Court reviews *de novo* the question of whether a state procedural rule is an "adequate and independent" state ground. *Luberda v. Trippett*, 211 F.3d 1004, 1006 (6th Cir. 2000).

To be adequate, a state procedural rule must be "'firmly established and regularly followed' by the time as of which it is to be applied." *Ford v. Georgia*, 498 U.S. 411, 424 (1991). To determine whether the rule is firmly established, the court should look to whether, at the time of the petitioner's actions giving rise to the default, the petitioner "could not be deemed to have been apprised of [the rule's] existence." *Id.* at 423 (quotation and citation omitted). A petitioner must show more than "[a]n occasional act of grace by a state court in excusing or disregarding a state procedural rule" in order for a federal court to conclude that the state procedural rule is inadequate because inconsistently applied. *Coleman*, 268 F.3d at 429 (quotation and citation omitted); *see also Dugger v. Adams*, 489 U.S. 401, 410 n.6 (1989).

---

(Tenn. 1997). The Act was in effect at the time Hutchison filed his second postconviction petition. At the time filed his second petition, therefore, Tennessee law provided for only one postconviction petition. Moreover, the latest date on which he could have filed *any* petition for postconviction relief under the Act was on May 10, 1996.

**(1) Due Process Tolling Under *Burford***

Hutchison argues that the Tennessee procedural rules are not adequate or independent because Tennessee courts apply a due process exception, first articulated in *Burford v. State*, 845 S.W.2d 204 (Tenn. 1992), to later-arising constitutional claims. *Burford* held that the state's previous three-year statute of limitations for postconviction petitions was facially constitutional, but recognized that there may be cases where the strict application of the limitations period would deprive prisoners of a meaningful opportunity to present their claims. In those cases, tolling of the statute of limitations is required to ensure that the statute is applied in a manner consistent with state and federal constitutional due process guarantees. *See id.* at 208

Following *Burford*, Tennessee courts have employed a due process balancing test to determine whether to apply a statute of limitations bar where "the grounds for relief actually arose after the limitations period would normally have commenced." *Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995). Under this rule, "[t]o determine whether a petitioner was denied a reasonable opportunity to present a claim, a court must balance the liberty interest in collaterally attacking the constitutional violations . . . against the State's legitimate interest in preventing the litigation of stale and fraudulent claims." *Wright v. State*, 987 S.W.2d 26, 28 (Tenn. 1999). This exception for later-arising claims has been applied to permit consideration of procedurally barred *Brady* claims in circumstances involving both successive petitions and statute of limitations problems. *Id.* at 26; *see also Sample v. State*, Nos. 02C01-9505-CR-000131, 02C01-9505-CR-00139, 1996 WL 551754, at *6-7 (Tenn. Crim. App. Sept. 30, 1996) (holding that trial court erred in dismissing successive postconviction petition without a hearing on waiver and statute of limitations grounds where facts alleged in petition showed that exculpatory evidence was suppressed until after limitations period had expired and after first petition was dismissed). In applying the *Burford* exception, Tennessee courts have established no formal constraints on the amount

*Burford* is based upon U.S. Supreme Court precedent and the Due Process Clause of the U.S. Constitution. *See Burford*, 845 S.W.2d at 207-08 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982)); *Seals v. State*, 23 S.W.3d 272, 277 (Tenn. 2000). Therefore, Hutchison asserts that the state court's determination of the waiver issue was necessarily based upon the application of federal constitutional law.

The Supreme Court rejected a similar argument in *Coleman*, 501 U.S. at 741-42. In *Coleman*, a habeas petitioner argued, relying on *Ake*, that the Virginia Supreme Court's decision that his appeal was barred by the statute of limitations was not independent of federal law because state law required tolling of the limitations period if denial of an extension of time would abridge a constitutional right. *Id.* at 741. The Court, after expressing some doubt as to whether *Ake* applied in the habeas context, concluded that "even if *Ake* applies here, it does [petitioner] no good because the Virginia Supreme Court relied on an independent state procedural rule." *Id.* The Court explained that the Virginia Supreme Court's tolling doctrine did not require state courts to examine the merits of the petitioner's federal constitutional claims before applying the bar. Instead, the Court concluded, "[a] more natural reading is that the Virginia Supreme Court will only grant an extension of time if *the denial itself* would abridge a constitutional right. That is, the Virginia Supreme Court will extend its time requirement only in those cases in which the petitioner has a constitutional right to have the appeal heard." *Id.* at 741-42. The Court then explained that the tolling rule was "of no help" to the petitioner's jurisdictional argument, because he did "not contend that the failure of the Virginia Supreme Court to hear his untimely state habeas appeal violated one of his constitutional rights." *Id.*

*Coleman* controls in the instant case. The *Burford* exception applies when the strict application of the statute of limitations would constitute a denial of federal and state due process rights by depriving the petitioner of a meaningful opportunity to present his claims. *Burford*, 845 S.W.2d at

**(2)  Independent State Grounds**

Hutchison also argues that the state postconviction court's determination that his claims were procedurally barred was intertwined with federal law, and therefore was not an "independent" state-law ground for denial of his petition. Hutchison bases this argument on *Ake v. Oklahoma*, 470 U.S. 68 (1985).  In *Ake*, the Supreme Court held that it had jurisdiction to review the merits of the defendant's constitutional due process claim on direct review from the Oklahoma Supreme Court, despite the Oklahoma Supreme Court's conclusion that the argument was waived under a state procedural rule.  *Id.* at 74.  The *Ake* Court reasoned that because the state-law waiver rule did not apply to constitutional errors, "[b]efore applying the waiver doctrine to a constitutional question, the state court must rule, either explicitly or implicitly, on the merits of the constitutional question."  *Id.* at 75.  Thus, the Court could review the state supreme court's decision insofar as that decision was premised upon a determination of the merits of the defendant's federal-law claim.  The Court explained that "when resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our jurisdiction is not precluded."  *Id.*

Hutchison argues that the Tennessee criminal appeals court's conclusion that his *Brady* claims were barred is similarly intertwined with federal law.  In order to reach the conclusion that his claims had been waived, Hutchison argues, the court had to consider whether, under *Burford*, Hutchison was afforded a fair opportunity to present his claims.  Hutchison argues that the exception recognized in

applied to cases like Hutchison's.  The enabling provision of the Act explicitly stated that the Act applied to "all petitions for post-conviction relief filed after [May 10, 1995, the effective date of the Act]."  *Id.* at 419. Therefore, Hutchison cannot maintain that the Act was not regularly applied to petitioners whose convictions became final prior to the Act's effective date.

of time that the statute may be tolled.  *Williams v. State*, 44 S.W.3d 464, 471 (Tenn. 2001).  In addition, as *Burford* made clear, Tennessee courts will sometimes toll the statute of limitations in cases where, as here, the grounds for relief became known after the statute of limitations began to run but before the limitations period completely expired. 845 S.W.2d at 209 (holding that an untimely claim should be allowed on due process grounds notwithstanding the fact that grounds for relief became known ten months before expiration of the statute).

Hutchison argues that Tennessee courts' willingness to excuse procedural default pursuant to *Burford* demonstrates that state procedural rules are not regularly followed in the context of later-arising claims.  The district court rejected this argument.  The court noted that *Burford* applied only to a narrow category of later-arising claims, which were not presented in the instant case.  The court also suggested that the 1995 amendments to the statute of limitations may have vitiated *Burford*, and limited the exceptions to the statute of limitations to the narrow grounds laid out in the statute. Dist. Ct. Op. at 21-22.  This reasoning is unpersuasive.  The district court's first point begs the question.  Hutchison has asserted that his claim is "later-arising" because he did not possess the factual predicate -- i.e., the *Brady* materials -- until it was too late to include them in his first postconviction petition.  As noted above, *Burford* tolling may be applied in cases where the reason for delay in bringing the claim was suppression of evidence by the prosecution.  *See Sample*, 1996 WL 551754, at *6-7.  The district court's second point is legally incorrect, insofar as the Tennessee Supreme Court has explained that the *Burford* exception continues to apply after the 1995 amendments.  *Williams*, 44 S.W.3d at 467 (remanding for further proceedings to determine whether counsel's misrepresentations to petitioner justified application of *Burford* exception to one-year statute of limitations under 1995 Act).

Nevertheless, we agree that Tennessee's due process exception does not render this provision inadequate.

Tennessee's due process exception does not grant unfettered discretion to state courts in applying procedural default rules. Although Tennessee courts will often permit the hearing of an untimely claim, the decision is confined by the due process standards delineated in *Burford* and its progeny. The Tennessee courts consistently enforce a procedural scheme that encompasses both the one-year limitations period and a court-recognized procedure for tolling that statute when specific due process grounds are presented. Indeed, the postconviction court purported to follow this procedure in Hutchison's case, insofar as it considered his claim that he did not have a meaningful opportunity to present his claims earlier. Nevertheless, it found he had not made the showing required to warrant tolling. *See Hutchison*, 1997 WL 776342, at *2.

We have suggested in similar contexts that the state procedural rules at issue in the instant case are sufficiently firmly established to provide an adequate and independent state grounds for decision. This Court has previously determined that Tennessee's waiver rule, T.C.A. § 40-30-206(g), which provides that claims not raised in a prior proceeding are barred, constitutes an adequate and independent state-law rule precluding habeas relief. *See Cone v. Bell*, 243 F.3d 961, 969 (6th Cir. 2001) (finding *Brady* claim procedurally barred by predecessor to T.C.A. § 40-30-206(g)), *rev'd on other grounds*, 122 S. Ct. 1843 (2002); *Coe v. Bell*, 161 F.3d 320, 331(6th Cir. 1998), *cert. denied*, 528 U.S. 842 (1999). In *Hannah v. Conley*, 49 F.3d 1193 (6th Cir. 1995) (per curiam), this Court found that the then-applicable three-year statute of limitations for postconviction petitions in Tennessee was regularly applied and would bar presentation of an unexhausted claim. *Id.* at 1197. The *Hannah* court noted that the language of the statute was mandatory in that it provided that a claimant "must" petition within three years or his claim "shall" be barred. *Id.* at 1196. The current one-year statute of limitations contains the same mandatory language. *See* T.C.A. § 40-30-202(a).

Although the previous cases did not present a *Burford*-type later arising claim, we do not find that the state's *Burford* tolling rules command a different result. In *Paprocki v. Foltz*, 869 F.2d 281 (6th Cir. 1989), we considered whether the Michigan state court had waived its right to enforce its procedural rule by briefly considering whether manifest injustice would result from a default. *Id.* at 285. This Court concluded that "[w]e would be loath to adopt an exception to the 'cause and prejudice' rule that would discourage state appellate courts from undertaking the sort of inquiry conducted by the Michigan court." *Id.* Similarly, in the instant case, to find that the repeated application of *Burford*-style tolling renders the Tennessee statute of limitations an inadequate basis to deny postconviction relief would have the unfortunate effect of discouraging a practice that provides states the opportunity to remedy unconstitutional convictions in cases involving later-arising claims.

Given that tolling under *Burford* is not discretionary and given this Circuit's reluctance to discourage state courts from exhibiting caution before applying procedural default rules in capital cases, we conclude that the *Burford* exception does not render Tennessee's procedural rules inadequate.[5]

_____

[5] Hutchison's brief also suggests that there was uncertainty, prior to *Carter v. State*, 952 S.W.2d 417 (Tenn. 1997), as to whether the Post-Conviction Procedure Act of 1995 applied to persons, like Hutchison, whose convictions became final prior to the passage of the Act. The issue resolved in *Carter*, however, was not whether the Act's limitations period applied to persons convicted before passage of the Act. Rather, the *Carter* court addressed the narrow question of whether the Act's provision that "any person having a ground for relief recognized under this act shall have at least one (1) year from the effective date of this act to file a petition" permitted the filing of new petitions by persons for whom the previous three-year statute of limitations had already expired. *Id.* at 420. The *Carter* court concluded that the one-year window was intended only to protect the rights of the "class of petitioners for whom the one year limitations period under the new law had expired but the three year limitations period under the old law had not." *Id.* Hutchison falls into the latter class of petitioners, and he therefore received one year from the effective date of the Act to file his claim. The *Carter* case does not suggest that there was any ambiguity as to whether the 1995 Act